Richard Johnson and his wife, Winnie Johnson, sued Norfolk Southern Corporation;[1] Norfolk Southern Railway Company ("NSR"); Alabama Great Southern Railroad Company ("AGS"), a wholly-owned subsidiary of NSR; Maurice Weldon, a conductor for AGS; and Thomas J. Archer, an engineer for AGS. Richard Johnson sought damages on claims of negligence and wantonness arising from injuries he sustained when his vehicle was struck at a railroad crossing by a train owned and operated by NSR and AGS and subsequently identified as "train W96." Johnson's wife asserted a derivative loss-of-consortium claim.[2]
In their respective answers, NSR, AGS, Weldon, and Archer denied "each and every material averment of [the Johnsons' complaint]" and asserted that the complaint failed to state a claim upon which relief could be granted; that Richard Johnson was "guilty of negligence in and about the manner in which he was operating his vehicle and that such negligence on his part proximately contributed to cause his damages"; and that Richard Johnson was "guilty of negligence in and about the manner in which he was operating his vehicle and that such negligence on his part was the sole proximate cause of his injuries." The defendants filed a motion for a summary judgment seeking a summary judgment as to all claims, but, in the alternative, a partial summary judgment as to the Johnsons' claims that the defendants were negligent and wanton (1) in that train W96 should have been traveling at a slower speed, because, they say, this claim was preempted by federal law; (2) in that NSR or AGS should have installed additional warning signs, signals, or devices at the railroad crossing where the *Page 519 
accident occurred, because, they say, this claim was also preempted by federal law; and (3) in NSR's and AGS's training of the crews of either train W96 or another train present at the crossing, "train A56." The Johnsons filed a response to the summary-judgment motion and stipulated to the dismissal of the following claims: any claim that train W96 should have been traveling at a slower speed; any claim that NSR and AGS should have installed any additional warnings, signs, signals, or devices at the crossing where the accident occurred; and any claim that NSR and AGS were negligent or wanton in training the crews of train W96 and train A56. After a hearing, the trial court entered an order; that order stated, in pertinent part:
 "[S]ufficient reasons exist for granting summary judgment as to any claims that the train should have been operated at a slower speed; to any claims that [NSR and AGS] should have installed additional warnings, signs, signals or devices at the crossing where the accident occurred; and any claims concerning the negligent or wanton training of the crew of either the W96 or A56 train. Summary judgment is denied as to any claims for negligence or wantonness on behalf of the employees of [NSR and AGS]; therefore, summary judgment is hereby granted in part and denied in part."
The Johnsons dismissed Weldon and Archer without prejudice immediately before trial, and the case proceeded to trial against NSR and AGS on the remaining claims of negligence and wantonness. At the close of the Johnsons' evidence, NSR and AGS filed a joint motion for a judgment as a matter of law ("JML"), which asserted, among other things, that Richard Johnson's own negligence proximately caused the accident, that the Johnsons' claims were preempted by federal law, and that there was insufficient evidence that NSR and AGS were guilty of negligence or wantonness. The trial court granted the motion "as to the count of wantonness." At the close of all evidence, NSR and AGS renewed their motion for a JML, on the same grounds previously asserted. The renewed motion was denied, and the case was submitted to the jury on the remaining claim of negligence.
The jury returned a verdict in favor of Richard Johnson. The trial court entered a judgment on the jury's verdict; that judgment stated in pertinent part, "[T]he Court orders that the plaintiff, Richard Johnson, recover from the defendants, Norfolk Southern Corporation and [AGS], the sum of SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($750,000). . . . [The court] denies all relief not granted in this judgment. This is a final judgment." (Capitalization in original; emphasis supplied.)
Subsequently, NSR and AGS jointly filed a renewed motion for a JML, or, in the alternative, a motion to alter, amend, or vacate the judgment and for a stay of the judgment. The renewed motion for a JML asserted the same grounds as the two previous JML motions. The motion to alter, amend, or vacate the judgment sought only to amend the judgment to substitute NSR for Norfolk Southern Corporation, against which the judgment had been erroneously entered. The trial court denied the renewed JML motion, but granted the motion to amend the judgment and ordered the judgment stayed upon the posting of appropriate security.
NSR and AGS appeal, arguing that the trial court erred in failing to grant their motions for a JML because, they say, (1) there was no substantial evidence of any negligence on their part; (2) Johnson was violating a traffic law when the accident occurred and was, therefore, *Page 520 
unquestionably negligent, and his negligence was a proximate cause, if not the sole proximate cause, of the collision made the basis of this action; and (3) federal law preempted any duty on the part of NSR and AGS to provide additional warning, such as, for example, a flagman, of an approaching train at a crossing where the mechanical signal devices were working properly and the approaching train's horn was being properly sounded.
Our standard of review of a motion for a JML is well-settled:
 "'[T]his Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). For actions filed after June 11, 1987, the nonmovant must present "substantial evidence" in order to withstand a motion for a JML. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala. 1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas Co., 599 So.2d 1126 (Ala. 1992).
 "'Furthermore, a jury verdict is presumed to be correct, and that presumption is strengthened by the trial court's denial of a motion for a new trial. Cobb v. MacMillan Bloedel, Inc., 604 So.2d 344 (Ala. 1992). In reviewing a jury verdict, an appellate court must consider the evidence in the light most favorable to the prevailing party, and it will set aside the verdict only if it is plainly and palpably wrong. Id.'
 "Delchamps, Inc. v. Bryant, 738 So.2d 824, 830-31
(Ala. 1999)."
I.C.U. Investigations, Inc. v. Jones, 780 So.2d 685, 688 (Ala. 2000).
 I. Facts
On February 27, 1999, a through-freight train[3] owned by AGS, designated as train W96, collided with a truck driven by Richard Johnson at the intersection of AGS's mainline railroad track and Constantine Road in Boligee. There were four sets of tracks at this intersection, running north and south, but only three sets intersected Constantine Road, which ran east and west. A motorist traveling west on Constantine Road, as Johnson was doing on February 27, would come first to the "siding track." In succession, the motorist would encounter, and pass over if a safe traverse of the crossing was accomplished, the "mainline track" and then the "house track." The "siding track" was used by *Page 521 
local-freight trains in the "switching" process; the "mainline track" was used by trains traveling between Meridian, Mississippi, and Birmingham, Alabama; and the "house track" was used as a storage track. The "proper track," another storage track, branched off the siding track to the east of the crossing and did not intersect Constantine Road. The crossing was equipped with crossbucks,[4] automatically activated flashing lights and an automatically activated bell, pavement markings, and "no passing zone" signs. As they did in the trial court, NSR and AGS assert in their brief to this Court that federal moneys had been used to install the passive warning devices, i.e., the crossbucks, the pavement markings, and the "no passing zone" signs and that, therefore, Johnson's state-law claims are preempted by federal law. Specifically, in their brief they state:
 "[I]n 1979, federal funds participated in the installation of railroad advance warning signs and no passing zone signs at the crossing. These warning devices were installed at the crossing by August 29, 1979. . . . Then, in 1991, federal funds once again participated in the installation of passive warning devices — this time, railroad advance, no passing zone signs, and `R x R' pavement markings — at the crossing. These warning devices were installed at the crossing by August 23, 1991."
Johnson did not object at trial to the affidavit and exhibits NSR and AGS submitted into evidence to support that assertion, and in his extensive statement of the facts in his brief to this Court he takes no issue with that assertion. It is undisputed that at the time of the accident, the flashing lights and the bell at the crossing were activated and were functioning properly.
On the day of the accident, a local-freight train, designated as train A56, was traveling from Meridian, Mississippi, to Birmingham; it approached the crossing from the south, headed north. Four crew members were aboard: Marty Brasher, the engineer; J.W. Pierce, the brakeman; Dusty Pierce, the conductor; and Henry Copelin,[5] a trainee conductor.[6] Train A56 had earlier stopped in Livingston to pick up railcars filled with dirt and had then proceeded to Boligee to pick up some wood-chip hopper cars from the proper track. J.W. Pierce testified that train A56 had been at the crossing for 15 or 20 minutes before the accident. That time was spent switching the dirt-filled cars and the wood-chip hopper cars. Throughout, the crossing signals were flashing and sounding, although the crossing was not physically blocked by train A56 during that whole process.
After train A56 finished the switching process, Brasher began to back train A56, which was on the siding track, off the crossing. The crew of train A56 knew that they could not get back on the mainline track until train W96, a through-freight train, came through Boligee because, according to Brasher, "[t]he dispatcher told us when we headed in or sometime during the process that we was [sic] going to be there for a W96." During the wait for train *Page 522 
W96 to pass through, Dusty Pierce and Copelin went to get snacks at a grocery store located to the west of the tracks; at the time of the accident, J.W. Pierce was on his way to the grocery store. The drivers of motor vehicles stopped at the crossing headed west, as was Johnson, could not see the approaching northbound train W96 because train A56, backing south on the siding track, blocked their view to the south of the crossing, i.e., to their left.
Train W96 was traveling north on the mainline track at approximately 40 miles per hour as it approached the crossing. The lights were flashing and the bell was ringing at the crossing; the headlight and ditch lights[7]
on train W96 were on, its locomotive horn was sounding, and its locomotive bell was ringing. The lead motor vehicle stopped at the crossing headed west was a Jeep Cherokee sport-utility vehicle driven by Georgia Means. She testified that she had been waiting at the crossing for 10 or 15 minutes while train A56 switched cars. Johnson, driving a mail truck, pulled up behind Means at the crossing at some point while she was waiting to cross. Johnson was a retired employee of the United States Postal Service, working part-time for West Alabama Postal Express, a private courier service. Means testified that she noticed the mail truck behind her when she "was getting ready to turn around to go another way," and she "looked back and seen him. And so [she] just sit still." She did not otherwise provide any information concerning how long Johnson was behind her before the collision.
Johnson, whose testimony was presented at trial only through the reading of his deposition, stated that he had no recollection of the accident. His last memory of that day was "early [that] morning at home." He acknowledged that his job required him to drive the Boligee route approximately 26 to 30 times a year, and that each time he drove the route he passed over the railroad crossing four times, using Constantine Road. In explaining his familiarity with activity at the crossing, Johnson testified:
 "Q: Was it fairly common to see trains on the [siding and mainline] tracks?
"A: Yes.
 "Q: Have you seen two trains at or near this crossing at the same time?
"A: I don't think I have. Do you mean —
"Q: One on one track and one on the other track.
"A: Yes. I have seen —
"Q: Okay.
 "A: I have seen, you know, one will be parked and the other one would be moving.
 "Q: Be moving. Okay. You knew those tracks were used on a fairly regular basis; is that correct?
"A: Yes.
 "Q: And you knew that from having driven over the track two to four times a week —
"A: Yes.
"Q: . . .for a number of weeks for about six years?
"A: Yes.
 "Q: Certainly no difficulty in knowing that the track is there, the lights and the track are there; right?
"A: No. *Page 523 
"Q: Just as you're approaching, you can easily see that?
"A: Yeah.
". . . .
 "Q: What is your understanding of a motorist's duty at a crossing which has flashing lights and the lights are flashing? What's a motorist supposed to do?
"A: He's supposed to stop.
 "Q: Had you ever been over this crossing or been at this crossing, I should say, when the lights were flashing because a train was approaching? Before this accident, had you been at this crossing when the lights were flashing for a train?
"A: Yes. The train would be moving.
"Q: Yes, sir.
"A: Yes.
 "Q: And on those occasions you would stop until the lights would stop flashing?
"A: Yes.
". . . .
 "Q: Mr. Johnson, at the time of this accident just to be sure, you knew from having been over it many times that there were two tracks here at this crossing; is that correct?
"A: Yes.
". . . .
 "Q: Well you had seen trains on both tracks from time to time?
"A: Yes.
 "Q: I believe you have already testified that there were times when you saw a train maybe stopped on one track and another train moving by on the other?
"A: Yes. Yes. I've seen trains parked on one track.
"Q: Coming by on the other track?
"A: Going by on the other track.
"Q: And that was before this accident that you had seen that?
"A: Yes."
Means stated that when train A56 cleared the crossing, the crossing lights were still flashing, but that she did not see another train because a "box car" was blocking her view. Thinking it was safe to go, she started across the tracks.
Another motorist, Mary Atkins, was traveling east and had been waiting on the other side of the crossing, at the house track, for approximately 10 minutes while the crossing was blocked by train A56. She testified that after train A56 backed off of the crossing, the lights were still flashing at the crossing:
 "Q: When it cleared the track, were the lights still flashing?
"A: Yes.
"Q: Could you see cars on the other side waiting?
"A: Yes.
"Q: How many?
 "A: When it cleared the track, I know there were two vehicles. It's a white Jeep or something and a mail truck."
At the time of the accident, Walter Taylor was working at the grocery store the crew members of train A56 had entered. He stated that the grocery store was located west of the railroad tracks and was therefore nearest the house track, and about 200 feet from the railroad crossing. Taylor testified that while he was waiting on customers, he saw, through the windows of the grocery store, train A56 operating on the tracks for 15 to 30 minutes. He stated that the crossing lights were blinking and that the bell was ringing throughout this time, except that the lights and bell may have "kicked off" once midway through the switching. Taylor stated that he saw the white Jeep clear the crossing and then the mail truck driven by Johnson pull into the Jeep's spot. According to Taylor, when train A56 had partly *Page 524 
cleared the crossing, the mail truck "had just turned in at that time . . . ." In response to questioning on that point, Taylor testified as follows:
 "Q: It is fair to say, isn't it, that based on what you saw, Mr. Taylor, that Mr. Johnson had just come to this crossing just a few seconds prior to his accident?
 "A: Well[,] yes. But there was a car sitting there. And as that car was sitting, the train came to a rest. As soon as the stationary train came to a rest, it hesitantly proceeded to go across the tracks.
"Q: I'm going to get to that of it —
"A: Okay.
 "Q: — in just a minute. All my point is that while you may have been watching this train move back and forth for 10 or 15 minutes, Mr. Johnson hadn't been there during that period of time?
"A: Not to [sic] whole time.
"Q: He was only there I think you told us maybe five seconds?
 "A: Well that was the time that he pulled up to do his momentary stop after the first car had crossed already. His total time was I would say between 10 to 20 seconds from the time he pulled in and the time he pulled up behind the car that was sitting there."
Archer testified that when he first saw the mail truck, it was already on the mainline track and at that point neither he nor Johnson could have avoided a collision. The train hit the mail truck, and Johnson was injured.
 II. Preemption
We find the following issue, as framed by NSR and AGS, to be dispositive:
 "Whether the trial court erred in failing to grant [NSR and AGS's] motions for [a JML] on the basis that [they] had no duty to provide additional warning of an approaching train at a crossing where the flashing lights were working properly and the train horn was sounded properly because federal law preempts any such claimed duty."
In response, Johnson, in his brief, explains his position as follows:
 "Johnson's specific state law-based negligence claim is not preempted by federal law.
 "In connection with railroad crossing accidents, there has been federal preemption of many possible state law-based negligence claims. As conceded by [Johnson] prior to trial, he was preempted from contending that the W96 train was traveling too fast or that additional permanent signaling or traffic control devices should have been installed at this crossing. [Johnson] will now concede that he would have been preempted from contending that a flagman had to [be] present whenever a `local' train was at or near this crossing . . . or that the W96 train had to deploy a flagman at the crossing because the A56 train was on the siding track. . . . [Johnson] only contends that he is not preempted from arguing that, on this occasion, the A56 train should have stayed put for a few additional minutes or, alternatively, one of the three A56 train crew members on the ground should have `flagged' the crossing until the W96 train passed."[8]
(Emphasis original.)
NSR and AGS cite Norfolk Southern Ry. v. Shanklin, 529 U.S. 344 *Page 525 
(2000), and CSX Transportation, Inc. v. Easterwood, 507 U.S. 658 (1993), in support of their argument that federal law preempts any claim by Johnson that they had a duty, on the occasion in question, to warn Johnson of the approach of train W96 beyond the signals already present at the crossing. In explaining the doctrine of preemption, theEasterwood Court stated:
 "Where a state statute conflicts with, or frustrates, federal law, the former must give way. U.S. Const., Art. VI, cl. 2; Maryland v. Louisiana, 451 U.S. 725, 746 (1981). In the interest of avoiding unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption. Thus, pre-emption will not lie unless it is `the clear and manifest purpose of Congress.' Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947). Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue. Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95 (1983). If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."
507 U.S. at 663-64. In Shanklin, the Court stated, in pertinent part:
 "In 1970, Congress enacted the Federal Railroad Safety Act (FRSA) `to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents.' 49 U.S.C. § 20101. The FRSA grants the Secretary of Transportation the authority to `prescribe regulations and issue orders for every area of railroad safety,' § 20103(a), and directs the Secretary to `maintain a coordinated effort to develop and carry out solutions to the railroad grade crossing problem,' § 20134(a). The FRSA also contains an express pre-emption provision, which states:
 "'Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.' § 20106.
 ". . . Three years after passing the FRSA, Congress enacted the Highway Safety Act of 1973, § 203, 87 Stat. 283, which, among other things, created the Federal Railway-Highway Crossings Program (Crossings Program), see 23 U.S.C. § 130. That program makes funds available to States for the `cost of construction of projects for the elimination of hazards of railway-highway crossings.' § 130(a). To participate in the Crossings Program, all States must `conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose.' § 130(d). That schedule must, '[a]t a minimum, . . . provide signs for all railway-highway crossings.' Ibid. *Page 526 
 "The Secretary, through the Federal Highway Administration (FHWA), has promulgated several regulations implementing the Crossings Program. One of those regulations, 23 C.F.R. § 646.214(b) (1999), addresses the design of grade crossing improvements. More specifically, §§ 646.214(b)(3) and (4) address the adequacy of warning devices installed under the program.[9] . . . Thus, at crossings where any of the conditions listed in (b)(3) exist, adequate warning devices, if installed using federal funds, are automatic gates and flashing lights. And where the (b)(3) conditions are not present, the decision of what devices to install is subject to FHWA approval."
Shanklin, 529 U.S. at 347-48 (footnote omitted). In Easterwood, the United States Supreme Court stated that "the provisions of23 C.F.R. § 646.214(b)(3) and (4) . . . establish requirements as to the installation of particular warning devices. Examination of these regulations demonstrates that, when they are applicable, state tort law is pre-empted." 507 U.S. at 670. The Shanklin Court reiterated its earlier holding in Easterwood, stating, "once the FHWA [Federal Highway Administration] has funded the crossing improvement and the warning devices are actually installed and operating, the regulation [§ 646.214(b)(3) or (4)] `displace[s] state and private decisionmaking authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained.'"529 U.S. at 354, quoting Easterwood, 507 U.S. at 670. The Shanklin
Court explained that "the FRSA's pre-emption provision dictates that, to pre-empt state law, the federal regulation must `cover' the same subject matter, and not merely '"touch upon" or "relate to" that subject matter.'"529 U.S. at 352. The Court when on to say:
 "When the FHWA approves a crossing improvement project and the State installs the warning devices using federal funds, §§ 646.214(b)(3) and (4) establish a federal standard for the adequacy of those devices that displaces state tort law addressing the same subject. At that point, the regulation dictates `the devices to be installed and the means by *Page 527 
which railroads are to participate in their selection.' [CSX Transp., Inc. v.] Easterwood, [507 U.S. 658] at 671 [(1993)]. It is this displacement of state law concerning the devices' adequacy, and not the State's or the FHWA's adherence to the standard set out in §§ 646.214(b)(3) and (4) or to the requirements of the MUTCD [Manual on Uniform Traffic Control Devices], that pre-empts state tort actions. Whether the State should have originally installed different or additional devices, or whether conditions at the crossing have since changed such that automatic gates and flashing lights would be appropriate, is immaterial to the pre-emption question."
529 U.S. at 357-58 (emphasis added).
It is clear that when federal funds are used to install warning devices at a railroad crossing, 23 C.F.R. § 646.214(b)(3) and (4) preempt state-law claims based upon inadequate signalization at railroad crossings. Easterwood, supra; Shanklin, supra; see also Ingram v. CSXTransp., Inc., 146 F.3d 858, 865 (11th Cir. 1998) ("we join the Fifth, Eighth, and Tenth Circuits in holding that the participation of federal funds in a grade crossing improvement project triggers FRSA preemption of a plaintiff's inadequate signalization claim"); National R.R. PassengerCorp. v. H P, Inc., 949 F. Supp. 1556 (M.D.Ala. 1996) (motorist's state-law claim of failure to supply adequate warning devices was preempted by federal regulations); and Pearson v. Columbus Greenville Ry., 737 So.2d 390, 398 (Miss.App. Ct. 1998) ("there must be proof here that these federal funds were part of a relevant project for upgrading and improving railroad crossings under the Highway Safety Act. If so, then issues regarding the adequacy of the crossing warnings — active or passive, mechanical or human — are preempted" (footnote omitted)).
As noted, Johnson, in his response to NSR and AGS's motion for a summary judgment, stipulated to the dismissal of "any claim that [NSR and AGS] should have installed any additional warnings, signs, signals, or devices at the crossing where the incident occurred," and the trial court entered the summary judgment for NSR and AGS, in part, "as to any claims . . . that [NSR and AGS] should have installed additional warnings, signs, signals or devices at the crossing where the accident occurred." Although the trial court entered a summary judgment as to that issue, NSR and AGS argue that the trial court later erred by allowing Johnson to argue before the jury that the crossing either should have been flagged with a flagman or should have been protected by train A56's remaining in a position in the crossing so as to prevent automobiles from passing through the crossing. In support of this argument, they cite23 C.F.R. § 646.204, which states, in part:
 "For the purposes of this subpart, the following definitions apply:
 "Active Warning Devices means those traffic control devices activated by the approach or presence of a train, such as flashing light signals, automatic gates and similar devices, as well as manually operated devices and crossing watchmen, all of which display to motorists positive warning of the approach or presence of a train.
". . . .
 "Passive Warning Devices means those types of traffic control devices, including signs, markings and other devices, located at or in advance of grade crossings to indicate the presence of a crossing but which do not change aspect upon the approach or presence of a train." *Page 528 
(Emphasis supplied.) A flagman at the crossing would clearly have been encompassed by the definition in the regulation of "active warning devices" and, therefore, included within the trial court's summary-judgment order. Further, Johnson's claim that train A56 "should have stayed put for a few additional minutes" so as to block the crossing is an assertion that warning devices at the crossing — passive and active — were not adequate, but all such claims are preempted in accordance with Shanklin,[10] supra, and Easterwood, supra.
In their brief, NSR and AGS also cite 49 C.F.R. § 234.105 through234.107 in support of their assertion that federal law preempted any duty on their part to provide additional warning of the oncoming train W96, and specifically state that "in addition to the preemptive federal regulations regarding warning devices, the federal regulations also specifically `cover the subject matter' regarding when a railroad may be required to flag at the crossing." Those regulations state that when certain situations are reported, a railroad may be required to flag a crossing. They mandate that when an active warning device failure, or only a partial activation of an active warning device, or a false activation is reported, "a railroad having maintenance responsibility for the highway-rail grade crossing warning system shall promptly initiate efforts to warn highway users and railroad employees at the crossing. . . ." by taking various precautions, including, "[i]f an appropriately equipped flagger provides warning for each direction of highway traffic, trains may proceed through the crossing at normal speed."49 C.F.R. § 234.105 and 234.107(c)(1)(i). NSR and AGS argue that under 49 C.F.R. § 234.105 through 234.107, a duty to provide a flagman can arise only when there has been "a credible report of a warning system failure, a partial activation, or a false activation. It is undisputed that none of these circumstances occurred in this case." Johnson does not take issue in his brief with this assertion.
Johnson does argue that an exception provided by 49 U.S.C. § 20106
is applicable *Page 529 
to his claims. 49 U.S.C. § 20106 states:
 "Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order
—
 "(1) is necessary to eliminate or reduce an essentially local safety or security hazard;
 "(2) is not incompatible with a law, regulation, or order of the United States Government; and
"(3) does not unreasonably burden interstate commerce."
(Emphasis supplied.) According to Johnson:
 "[T]he `essentially local safety hazard' in the present matter was the A56 train backing off the crossing at the same time that [the] W96 train is fast approaching the crossing. The `essentially local safety hazard' existed because the A56 had been blocking the crossing for a significant period of time. . . ."
Although Johnson states that the local safety hazard existed because of the length of time the crossing was blocked by train A56, Taylor's undisputed testimony established that Johnson's total time at the crossing was "between 10 to 20 seconds."
Johnson states that "AGS must show the promulgation of an applicable `nationally uniform' rule and must establish the inapplicability of the exception." He argues:
 "AGS fails to show a federally-promulgated rule or set of rules (a) that would have prevented the A56 train from delaying its backing off the crossing until after the W96 train passed by or (b) that established an all-encompassing system for the use of flagmen in special situations. As to the former, AGS is totally silent; as to the latter, AGS directs this Court's attention to 49 C.F.R. § 234.105 through 234.107. Those three regulations address what must be done if the installed signaling device is not functioning properly, and not what must be done when a train on a siding track is backing off a rural crossing at the same time that a `through' train is approaching the crossing on the main track.
". . . .
 ". . . AGS proffered evidence that a train or railcars might be present on the siding tracks when a train passed by on the main track but presented no evidence that a A56 train had ever, much less regularly, backed off the crossing when a W96 train was fast approaching the crossing. AGS presents no federally promulgated regulation addressing this particular situation."
(Emphasis original.)
Contrary to Johnson's assertion, 23 C.F.R. § 646.214(b)(3)(i)(B) specifically addresses the conditions at the crossing in question, i.e., "[m]ultiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing." Because the conditions present at the crossing in this case are specifically anticipated and addressed by 23 C.F.R. § 646.214(b)(3)(i)(B), *Page 530 
those conditions cannot be characterized as an essentially local safety hazard. In Earwood v.Norfolk Southern Ry., 845 F. Supp. 880, 888 (N.D.Ga. 1993), the Court reasoned as follows:
 "Local hazards to which the second savings clause applies are `unique local conditions,' or `specific, individual hazards.' [CSX Transp., Inc. v.] Easterwood, 507 U.S. [658] at [675] n. 15, 113 S.Ct. at 1743 n. 15 [(1993)]. General tort law is concerned only with local hazards in the sense that application turns on the facts of each case, and thus does not come within the second savings clause. Id. The second savings clause was designed to allow states to respond to local situations, not statewide in character, and which cannot be adequately dealt with by uniform national standards. National Ass'n of Regulatory Util. Comm'rs v. Coleman, 542 F.2d 11, 14-15 (3rd Cir. 1976). Conditions such as multiple tracks, and the possibility of cars or locomotives sitting at an intersection are specifically addressed by a national regulation. See 23 C.F.R. § 646.214(b)(3)(i).
". . . .
 "The conditions at the intersection — multiple tracks and rail cars obstructing the view — are not unique local conditions or specific individual hazards. These conditions can and do happen at many intersections in the state, and therefore are not unique to the locality at issue. The Court holds that such conditions are not local hazards within the meaning of the second savings clause."
(Emphasis supplied.)
The court in Wright v. Illinois Central R.R., 868 F. Supp. 183, 187
(S.D.Miss. 1994), also discussed the applicability of the "local safety hazard" savings clause found in 49 U.S.C. § 20106:
 "Plaintiffs apparently seek to avoid preemption by claiming the crossing here is `extrahazardous' because of `vegetation, grade and angle of the crossing, and inadequate warnings. . . .' Pls.' Mem.Br. at 9.
 "However, both the Supreme Court and the district court in Bowman [v. Norfolk Southern Ry., 832 F. Supp. 1014 (D.S.C. 1993),] rejected nearly identical arguments. In [CSX Transp., Inc. v.] Easterwood[, 507 U.S. 658 (1993),] the Supreme Court noted:
 "'The state law on which [Easterwood] relies is concerned with local hazards only in the sense that its application turns on the facts of each case. The common law of negligence provides a general rule to address all hazards caused by lack of due care, not just those owing to unique local conditions. [Easterwood's] contrary view would completely deprive the Secretary of the power to pre-empt state common law, a power clearly conferred by § 434.'
 "Easterwood, 507 U.S. at [675], 113 S.Ct. at 1743, 123 L.Ed.2d at 403-04. This Court again agrees with the conclusion of the Bowman Court that, were the Court to accept Plaintiffs' argument concerning this `local hazard exception,' the exception would swallow the clear intent of the FRSA to preempt state law. Bowman, 832 F. Supp. at 1018; accord, Williams v. Alabama Great So. R.R. Co., . . . (E.D.LA., August 8, 1994) [(unpublished opinion)].
 "Further, as the Eleventh Circuit Court of Appeals observed in its review of the Easterwood case, '[T]he legislative history [of the FRSA] makes it abundantly clear that this savings clause is to be narrowly construed.' Easterwood v. CSX Transportation, Inc., *Page 531 933 F.2d 1548, 1553 n. 3 (11th Cir. 1991) (citing H.Rep. No. 1194, 91st Cong., 2d Sess. 11 (1970)). Plaintiffs' common-law theory of negligence for failure to slow a train under certain circumstances (where `local hazards' exist), would amount to a statewide rule. The Court holds that the narrow exception provided by the savings clause for `local safety hazards' cannot be applied to uphold the application of such a statewide rule. Accord, Norfolk Western Ry. Co. v. Public Utilities Commission, 926 F.2d 567, 571 (6th Cir. 1991); Bowman, 832 F. Supp. at 1018. Because the crossing at which the collision in this case occurred is not `an essentially local safety hazard,' the savings clause is not applicable here."
(Emphasis supplied.)
Johnson cites no law of, or regulation, or order adopted by, the State of Alabama that would have established a duty on the part of AGS and NSR either to flag the crossing with a crew member or to leave train A56 blocking the crossing, under the circumstances present in this case. SeeMyers v. Missouri Pacific R.R., 52 P.3d 1014, 1025 (Okla. 2002) ("for a state law to meet the requirements of the FRSA saving clause, it must be narrowly addressed to a particular (essentially) local safety hazard"). The "additional or more stringent law, regulation, or order" Johnson relies upon is simply the general tort-law principal that a failure by one under a duty to take, or refrain from taking, certain action, to act accordingly, when it is foreseeable that failure to do so may result in injury to another to whom that duty is owed, can support a civil action for damages. See Alabama Utilities Co. v. Champion, 230 Ala. 263,160 So. 346 (1935).
Although Johnson does not phrase his argument in terms of the inadequacy of the warning devices at the crossing, his assertions either that train A56 should have "stayed put," thereby blocking the crossing, or that a crew member should have flagged the crossing, are in actuality claims that the warning signals already present at the crossing, i.e., pavement markings, "no passing zone" signs, crossbucks, and automatically activated flashing lights and an automatically activated bell, were inadequate because of the multiple tracks and view-obstructing position of train A56, and that further warning was needed.
In summary, the trial court's summary judgment for NSR and AGS on "any claims that [they] should have installed additional warnings, signs, signals or devices at the crossing where the accident occurred" eliminated any claim that a duty on their part to install additional warning devices may have existed. Further, it is undisputed that federal funds were used in installing the passive warning devices at the crossing; therefore, under the rule of Shanklin, supra, and Easterwood, supra, any claim that the signalization at the crossing was inadequate is preempted by federal law. Lastly, there was no "essentially local safety or security hazard" present at this crossing so as to satisfy the savings clause of 49 U.S.C.A. § 20106 because (1)23 C.F.R. § 646.214(b)(3)(i)(B) directly addresses the conditions at the crossing in question; (2) Johnson relies upon a general tort-law principal, not a "law, regulation, or order related to railroad safety or security"; and (3) although Johnson states that the local safety hazard existed because of the amount of time the crossing was blocked by train A56, he was not affected by the special condition of the long wait. Accordingly, the trial court erred by refusing to grant NSR and AGS's motions for a JML based upon federal preemption.
 III. Conclusion
For the foregoing reasons, the trial court's order denying NSR and AGS's *Page 532 
motion for a JML is due to be, and hereby is, reversed and a judgment rendered in favor of Norfolk Southern Railway Company and Alabama Great Southern Railroad Company.
REVERSED AND JUDGMENT RENDERED.
HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, WOODALL, and STUART, JJ., concur.
MOORE, C.J., concurs in the result.
[1] Norfolk Southern Corporation was never served with process; Rule 4(f), Ala.R.Civ.P., provides, in pertinent part: "When there are multiple defendants and the summons (or other document to be served) and the complaint have been served on one or more, but not all, of the defendants, the plaintiff may proceed to judgment as to the defendant or defendants on whom process has been served . . . ."
[2] The jury did not award Winnie Johnson damages on her loss-of-consortium claim; because she has not cross-appealed, she is not a party to this appeal.
[3] A through-freight train is one that proceeds from its departure point to its destination point without stopping and picking up or setting out freight cars. A local-freight train, by contrast, is one that stops to pick up and set out freight cars, called "switching," at various locations along its route.
[4] Crossbucks are "[t]he familiar black-and-white, X-shaped signs that read `RAILROAD CROSSING'. . . ." Norfolk Southern Ry. v. Shanklin,529 U.S. 344, 350 (2000).
[5] Henry "Copelin" is also referred to as Henry "Copeland" in the record.
[6] According to Brasher's testimony, a brakeman's job basically consists of groundwork such as disconnecting and reconnecting the railcars, called "switching"; a conductor is responsible for paperwork and helps with switching the railcars; an engineer is responsible for operating the train and taking care of the engines.
[7] Ditch lights are bright lights located on either side of the locomotive, much like automotive headlights.
[8] Since Johnson conceded the issue whether additional permanent devices should have been installed at this crossing, we are not called upon to consider what, if any, viable causes of action might have been available, in any forum, by virtue of the fact that23 C.F.R. § 646.214(b)(3) mandates that automatic gates be installed at crossings where the tracks are configured as they were at the crossing at which the accident occurred, see note 9, although, for reasons not explained in the record, no such gates had been installed at the crossing.
[9] 23 C.F.R. § 646.214(b)(3) and (4) read:
 "(3)(i) Adequate warning devices, under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:
"(A) Multiple main line railroad tracks.
 "(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.
 "(C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.
 "(D) A combination of high speeds and moderately high volumes of highway and railroad traffic.
 "(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.
"(F) A diagnostic team recommends them.
 "(ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA [Federal Highway Administration] may find that the above requirements are not applicable.
 "(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA."
(Emphasis supplied.)
[10] As discussed below, the crossing at issue in Shanklin had only passive warning devices, i.e., "advance warning sign and reflectorized crossbucks." 529 U.S. at 350. The two Justices dissenting in Shanklin, supra, argued as follows:
 "A fatal accident occurred on October 3, 1993, at a railroad crossing in Gibson County, Tennessee. The crossing was equipped not with automatic gates or flashing lights, but only with basic warning signs installed with federal funds provided under the Federal Railway-Highway Crossings Program. See 23 U.S.C. § 130. This federal program aimed to ensure that States would, '[a]t a minimum, . . . provide signs for all railway-highway crossings.' § 130(d). No authority, federal or state, has found that the signs in place at the scene of the Gibson County accident were adequate to protect safety, as distinguished from being a bare minimum. Nevertheless, the Court today holds that wholesale federal funding of improvements at 196 crossings throughout 11 west Tennessee counties preempts all state regulation of safety devices at each individual crossing. As a result, respondent Dedra Shanklin cannot recover under state tort law for the railroad's failure to install adequate devices. And the State of Tennessee, because it used federal money to provide at least minimum protection, is stopped from requiring the installation of adequate devices at any of the funded crossings."
529 U.S. at 360. Although the logic of that position is appealing, as Justice Breyer noted in his special concurrence, it did not carry the day, and we are obliged to follow and apply the majority opinion joined by seven members of the Court. "`This Court may rely on a decision of any federal court, but it is bound by the decisions of the United States Supreme Court.' [Ex parte] Gurganus, 603 So.2d [903] at 908 [(Ala. 1992)] (Shores, J., concurring specially) (emphasis in original) . . . ." Weemsv. Jefferson-Pilot Life Ins. Co., 663 So.2d 905, 913 (Ala. 1995).