[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1054 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1055 
These five consolidated appeals involve two filed by the defendant Systrends, Inc., two filed by the defendant Richard Brooks, and one filed by the plaintiff Group 8760, LLC ("Group 8760" or "8760").
The posttrial events giving rise to these appeals are accurately summarized by Brooks and Systrends in their respective but identical explanations of those events in their briefs, as follows:
 "The trial court entered judgment on a jury verdict on February 10, 2005. Systrends and Brooks timely filed post-judgment motions on March 11, 2005. Group 8760 filed a motion for permanent injunction and a motion for attorneys' fees. By order signed on May 31, 2005, and entered on June 1, 2005, the trial court granted a new trial on the claims against Systrends and Brooks for misappropriation of trade secrets, denied Brooks' motion for new trial on the breach of fiduciary duty claim, conditioned upon 8760's refusal of a remittitur, and denied defendants' post-judgment motions in all other respects. This ruling effectively denied or rendered moot 8760's motion for a permanent injunction and motion for attorneys fees, both of which were premised upon the alleged misappropriation of trade secrets.
 "On June 1, 2005, 8760 filed a motion to alter, amend or vacate the order granting a new trial. Group 8760 also filed a Consent to Remittitur consenting to the remittitur of the punitive damages on the breach of fiduciary duty claim and purporting to consent to a remittitur *Page 1056 
(that had not been ordered) of punitive damages on the trade secrets claim. By order entered July 5, 2005, the court granted 8760's motion, vacated the portion of its prior order granting a new trial on the trade secrets claim and ordered a remittitur of the punitive damages on the trade secrets claim.
 "On July 7th and 8th respectively, Systrends and Brooks filed motions to alter, amend or vacate the court's order entered on July 5, 2005. Systrends and Brooks timely filed their initial notices of appeal on July 8, 2005 (Case Nos. 1041548 and 1041569 respectively), within 42 days of the entry of the initial order on their post-judgment motions and the order on 8760's subsequent motion, and advised the Clerk of Court that the appeal should be held in abeyance pending disposition on their July 7th and 8th motions.
 "On August 3, 2005, the trial court denied Systrends' and Brooks' July 7th and 8th motions. Pursuant to Rule 4, Ala. R.App. P., the judgment became final upon the disposition of these motions, and the notice of appeal became effective.
 "By order dated August 11, 2005, however, the trial court purported to re-enter judgment in accordance with the jury's verdicts, as remitted. This order also included [Rule] 54(b)[, Ala. R. Civ. P.,] final judgment language. On August 23, 2005, and September 15, 2005, respectively, Systrends and Brooks timely filed notices of appeal from the August 11, 2005, judgment (Case Nos. 1041795 and 1041930).
 "[The defendants believe] that the February 10, 2005, judgment became final after the court disposed of Systrends' and Brooks' July 7th and 8th motions to alter, amend or vacate the order entered on July 5, 2005, which was the last pending post-judgment motion. Group 8760's request for attorneys fees and an injunction were denied or rendered moot by the granting of a new trial on the trade secrets claim, and those motions were not renewed after the new trial order was set aside and the judgment effectively reinstated. However, if the February 10, 2005, judgment was not a final judgment, the order entered on August 11, 2005, which included 54(b) language, was final and appealable. In either case, this Court has jurisdiction over Systrends' and Brooks' appeals pursuant to Ala. Code 1975, § 12-22-2."
(Systrends' principal brief, pp. v-viii; Brooks's principal brief, pp. vi-ix.)
None of the parties has discussed further which appeal out of the pair of appeals each defendant has taken should be recognized as the appropriate one, but we agree with the defendants that, in any event, this Court has jurisdiction of a properly perfected appeal by each defendant. Therefore, we will simply refer to, and dispose of, "Systrends' appeal" and "Brooks's appeal," without attempting to determine which appeal in each pair is the procedurally appropriate one.
As last amended, Group 8760's complaint asserted that Brooks, its former employee, had breached the restrictive covenant of his employment contract with Group 8760, had breached his fiduciary duty to Group 8760, and had misappropriated trade secrets of Group 8760 in violation of the Alabama Trade Secrets Act, §§ 8-27-1 through 8-27-6, Ala. Code 1975 (hereinafter sometimes "the ATSA"). Group 8760 claimed that Systrends, as Brooks subsequent employer, had interfered with Group 8760's employment contract with Brooks and had also violated the ATSA.
On the eve of the setting of the first trial in this case, Brooks filed a voluntary petition *Page 1057 
in bankruptcy, thus occasioning under the United States Bankruptcy Code an automatic stay of the case. After the bankruptcy court lifted that stay, the case proceeded to jury trial on January 24, 2005. Midway through the trial the bankruptcy court entered an order "discharging" Brooks's debts. The jury returned verdicts on February 9, 2005, finding in favor of Group 8760 and against the defendants on all claims and awarding damages as follows: against Systrends for misappropriation of trade secrets, $5,900,000 in compensatory damages and $9,400,000 in punitive damages; and for intentional interference with contractual relations, $1,000,000 in compensatory damages and $3,200,000 in punitive damages, for a total award against Systrends of $19,500,000; against Brooks for breach of contract, $150,000 in compensatory damages; for breach of fiduciary duty, $252,500 in compensatory damages and $1,400,000 in punitive damages; and for misappropriation of trade secrets, $1,750,000 in compensatory damages and $4,000,000 in punitive damages, for a total award against Brooks of $7,552,500.
 Standard of Review
In reviewing the denial of a motion for a judgment as a matter of law or the denial of a motion for a new trial, we consider the evidence in a light most favorable to the prevailing party, resolving all factual disputes in its favor. Alabama PowerCo. v. Aldridge, 854 So.2d 554 (Ala. 2002); AlabamaGreat Southern R.R. v. Johnson, 874 So.2d 517 (Ala. 2003). Viewed under that standard, the facts pertinent to these appeals are as follows.
 Facts
Brooks, a computer programmer, began creating software in the early 1990s for conducting commercial transactions over the Internet. By 1996, he was developing software that could be used to conduct such transactions within the energy industry. This software, as used in that industry, is referred to as "GISB EDM" software.
GISB is an acronym for the Gas Industry Standards Board,[1] a consortium of entities and individuals that promulgates standards by which companies in the energy industry engage in commercial trades and transactions involving both natural gas and electricity. EDM is an acronym for electronic delivery mechanism, which is the specific technology used to accomplish those transactions. GISB EDM software, then, is software that is capable of conducting commercial business electronically under the standards promulgated by GISB. The Federal Energy Regulatory Commission requires that entities use GISB EDM-compliant software to conduct transactions involving certain interstate natural-gas pipelines. 18 C.F.R. § 284.12. Brooks became so proficient with those standards that in 1998 he was elected co-chair of the GISB committee charged with drafting and revising the EDM standards, and, as co-chair, he largely wrote the EDM standards.
In 1996, Brooks cofounded Group 8760, which was headquartered in Birmingham, and entered into an employment agreement with the company to serve as its chief technical officer. Another cofounder, John Williams, was to serve as president and chief executive officer. Brooks's work at Group 8760 focused upon developing, maintaining, and intermittently upgrading a version of GISB EDM software for use *Page 1058 
by utilities. After approximately four years of work dedicated to that end, Group 8760 placed on the market its product, originally named GISBAgent, and later, during the time relevant to this appeal, InsideAgent. As of 2001, InsideAgent was one of five commercially marketed versions of GISB EDM software; at the time of trial, four such software packages were sold commercially.
Brooks's employment agreement with Group 8760 contained a section entitled "Non-competition Agreement and Partial Restraint of Trade." That section provided that "during the term of his employment and for one (1) year following such employment, . . . [Brooks] shall not, without the prior consent of [Group 8760], directly or indirectly, engage in any similar or related business in competition with [Group 8760]" and described "the territory within which [Group 8760's] business is performed" as "the entire world." That section further provided that for the same one-year period Brooks would not
 "directly or indirectly, solicit or divert business from, or attempt to convert to other methods of using the same or similar services provided by [Group 8760] to any of [Group 8760's] clients, either for his own benefit or for the benefit of any other person, partnership, corporation or other entity whatsoever."
 Additionally, that section provided:
 "[A]s a result of his employment with [Group 8760], [Brooks] has acquired, made use of and added to confidential information of a special and unique nature and value set forth in, or relating to such matters as [Group 8760's] systems, compilations, files, computer software, lists, books, literature, devices, methods, techniques, processes, procedures, manuals, confidential reports, customer lists or records, price schedules, videotapes, audio recordings, marketing materials of any type, products and other materials or records (collectively, `Proprietary Information')."
Finally, Brooks acknowledged in that agreement that this proprietary information "constitute[d] `trade secrets' under the Alabama Trade Secrets Act of 1987," that those trade secrets belonged to Group 8760, and that Brooks would not use for his benefit or divulge, or allow others to use or divulge, "any such Proprietary Information, confidential information, or trade secrets."
The employment agreement stipulated that the invalidity or unenforceability of any particular provision would not affect the enforceability of other provisions and, specifically, that in the event any provision relating to "geographical areas of restriction shall be declared by a court of competent jurisdiction to exceed the maximum . . . geographical areas such court deems reasonable and enforceable, the . . . geographical areas of restriction deemed reasonable and enforceable by the court shall become and be the maximum . . . geographical area." The agreement also contained a "severability" clause.
In the spring of 2001, following several years of substantial losses, Group 8760 stepped up its efforts to attract venture-capital investments and began searching for companies that might be interested in buying Group 8760, enlisting the services of Legacy Capital, a company specializing in marketing technology companies. Because of Brooks's "confrontational" management style, Williams had removed him from "day-to-day responsibilities" in late 2000, and later proposed that Brooks simply resign. The terms of Brooks's resignation could not be agreed upon, and Williams finally told him "just continue on the way you are" until the company could be sold, "working on the standards groups" and following up on certain prospects *Page 1059 
as buyers of the company. Group 8760 had compiled a list of almost 100 companies as potential buyers, but the technology industry was experiencing problems in 2001, when what Williams characterized at trial as "the big tech wreck on the stock market" occurred. In March or April 2001, Brooks asked Williams if Brooks could approach Sterling Commerce ("Sterling") about acquiring Group 8760. Williams ranked Sterling as one of the top five prospects for acquiring Group 8760. Williams agreed that Brooks could contact Sterling, and Brooks obtained a copy of the "offering memorandum" that Legacy Capital had prepared for submission to acquisition prospects, but Williams never heard anything more from Brooks about the idea. In connection with their discussions about Brooks's possible resignation from Group 8760, Williams had told him that Sterling was a company he was prohibited under the employment agreement from going to work for after resigning.
In August 2001, Williams found out that in May Brooks had gone to Ohio to meet with various representatives of Sterling for a job interview. Brooks had routed all of his communications with Sterling through his personal e-mail address, so that no record would appear on Group 8760's e-mail server. In advance of his job interview with the Sterling officials, Brooks sent them his resumé and otherwise touted the contributions he could make to their company. When he made the trip to Ohio, Brooks told Williams simply that he was taking a couple of days of vacation time, without disclosing his destination. Not only did Williams not know until August that Brooks had interviewed for a job with Sterling, but he also did not know that Brooks had met with Sterling at all. When Williams confronted Brooks and asked him what he had talked to Sterling about, Brooks refused to tell him what had been discussed, claiming that he had signed a nondisclosure agreement with Sterling.
Williams testified that he was shocked that a co-owner and the chief technical officer of Group 8760, knowing that they were trying to sell the company to Sterling, among other prospects, would sign a nondisclosure agreement and interview for a job with Sterling. "That would just wreck any possible acquisition by Sterling. Why would they buy us, if they could hire the chief technical officer." Williams insisted to Brooks that he should reveal what he had discussed with Sterling, arguing that Brooks had a fiduciary responsibility to Group 8760 first and foremost and that it was a breach of that responsibility to sign confidentiality agreements with other companies. Brooks nonetheless refused to discuss the matter. On August 24, 2001, Group 8760 terminated Brooks's employment "for cause."
After Brooks's employment was terminated, he discontinued using his Group 8760 e-mail address; that change was noticed by Dave Darnell, president of Systrends, who inquired of Brooks about it. When Brooks advised that he was no longer employed with Group 8760, Darnell explored the possibility of Brooks's coming to work with Systrends as project manager for a project it had undertaken for the Electric Reliability Council of Texas ("ERCOT"). Brooks was agreeable to the employment, and Darnell hired him as the project manager for the ERCOT job; Darnell testified that Brooks started on that job in mid-September but an e-mail from Darnell to his lawyer on September 27 stated that Brooks "is an hourly consultant now, but we have made plans to add him as an employee very soon. He has been working for me since September 6th at ERCOT in Texas." Brooks told Darnell about the noncompetition provision in his *Page 1060 
employment agreement with Group 8760. Although Brooks and Darnell testified that Systrends was not then a competitor of Group 8760's, Jim Mark, chief operation officer for Group 8760 until February 2002, and Williams testified that Systrendswas a competitor of Group 8760's.
There was evidence presented in the form of testimony from James Buccigross, Group 8760's vice president of energy practice, Mark, and Williams, and the contents of various exhibits from which the jury could have concluded that Systrends, with Brooks's active participation, was working on the development of GISB EDM solution software during the one-year period following Brooks's termination by Group 8760. For example, Mark testified that at a meeting of the Texas Data Transport Working Group in late 2001 or early 2002, Brooks and Darnell told those present that "they were developing the GISB EDM solution for ERCOT." Also, Brooks acknowledged during his testimony that it was already planned when he became the director of the ERCOT project that ERCOT was going to have a GISB EDM solution.
Although Systrends never completed a GISB EDM solution for ERCOT, it "finished up" that work for the purpose of installing a GISB EDM solution for another company, Dynergy, in September or October 2002. Darnell made Brooks the project manager for the installation of the GISB EDM solution for Dynergy, assisted by Casey Payne. Systrends had hired Payne in January 2002 to work on the second phase of the ERCOT project. He had been a programmer at Group 8760 during Brooks's tenure there and was hired by Systrends on the strong recommendation of Brooks, who promoted him to Darnell and others as having written about 70 percent of GISBAgent. Brooks's contention at trial was that, although he "was building a GISB EDM solution for ERCOT," there was no competition with Group 8760 because Systrends had obtained the ERCOT contract before Brooks left Group 8760. Buccigross testified that in 2001 Group 8760 had a list of potential clients and customers that it was interested in and that ERCOT was one of the customers it was trying to pursue.
After his initial designation by Systrends as a consultant, Brooks officially became an employee of the company, and its vice president of secured systems, on November 12, 2001. Although Brooks asserted at trial that when ERCOT required the addition of a GISB EDM solution to their software system he was removed by Darnell as project manager for that job to prevent any violation of the terms of his employment agreement with Group 8760, there was substantial evidence indicating that Brooks continued to be actively involved in the attempted facilitation of a GISB EDM solution for ERCOT. We refrain from identifying all relevant evidence, including the contents of various trial exhibits, given that our determinations with respect to certain of the claims asserted by Group 8760 will permit a new trial.
On September 27, 2001, Group 8760's attorney sent Systrends a letter asserting that Brooks's employment constituted a violation of the noncompetition provision of his employment agreement with Group 8760; Systrends received the letter that same day but never responded to it.
Extensive testimony from Buccigross, Mark, Brooks, and Darnell and numerous exhibits were devoted to the circumstances and implications of a contract Systrends bid on and obtained from Potomac Electric Power Company ("PEPCO"), the electric company operating in Washington, D.C. Systrends had originally responded in March 2001 to a "request for proposal" *Page 1061 
issued by PEPCO, but had resubmitted and revised its bid on two occasions in November 2001. Group 8760 had also submitted a bid for the PEPCO contract. Brooks testified that when he became an employee of Systrends on November 24, 2001, he did not know who was competing with Systrends for the PEPCO project; Group 8760, however, introduced an internal e-mail transmitted by Systrends on November 26 to Brooks as one of only three recipients, noting that Systrends was "in direct competition with Group 8760's InsideAgent product" on the PEPCO proposal and that PEPCO wanted to know what advantages the system Systrends was proposing had over Group 8760's product.
Brooks insisted in his testimony that his only involvement in Systrends' efforts to win the PEPCO contract was participating in a single conference call with PEPCO in late November 2001, during which he functioned solely in his role "as the GISB EDM co-chair" in order to answer any questions PEPCO might have concerning planned changes in the GISB EDM standards that Brooks was helping to revise. Brooks was adamant that he had not been involved in any other way in communicating about, or assisting in composing and presenting, the bid. However, Group 8760 introduced various internal Systrends e-mails from which the jury could have inferred that Brooks had participated much more than he acknowledged. For example, a November 15, 2001, internal Systrends e-mail discussed the need to demonstrate to PEPCO the GISB EDM solution contained within a particular piece of Systrends software and stated that Brooks "will advise us on the best way to handle this." The aforementioned November 26 e-mail concluded with the request that Brooks get in touch with another Systrends official involved with the PEPCO bid as soon as Brooks arrived in Systrends' Arizona office, in order to identify advantages the Systrends proposal had over Group 8760's InsideAgent. Brooks was a recipient of numerous other e-mails circulated within Systrends concerning its efforts to obtain the PEPCO bid.
After Systrends won that bid, Darnell sent an e-mail on December 20 to Brooks as one of only three Systrends' officials, thanking them for their contributions. Darnell acknowledged in testimony that he knew that company engineers were asking Brooks "standards questions" during the PEPCO bid process and might have asked him questions about GISBAgent, but that it was up to Brooks to refuse to answer questions when to do so would have violated his employment agreement with Group 8760. Brooks himself acknowledged during his testimony that if his communications with Systrends personnel or with PEPCO representatives involved anything other than neutral discussions of GISB standards, those communications would have been a violation of his employment agreement; when asked if "participating and helping Systrends in a bid for this PEPCO work, would have been in violation of your employment agreement," he answered, "Absolutely."
In both of the proposals Systrends submitted to PEPCO in November 2001, Brooks was identified as a member of the "management team," and numerous attributes of his expertise and experience were listed. Although Systrends introduced evidence indicating that it won the PEPCO contract over Group 8760 (which was its only competitor for that contract in the final analysis) on the basis of price, Group 8760 introduced an e-mail transmitted internally at Systrends by Brandon Seigel, a Systrends senior consultant on the PEPCO bid, advising that he had been told by PEPCO that Systrends won the contract *Page 1062 
because "[o]ur people were the deciding factor, not the product!"
 Systrends' Challenge to Jurisdiction
At each stage of the litigation, Systrends asserted that the trial court lacked personal jurisdiction over it. We recognize that
 "`[t]he plaintiff bears the burden of proving the court's personal jurisdiction over the defendant.' Daynard v. Ness, Motley, Loadholt, Richardson Poole, P.A., 290 F.3d 42, 50 (1st Cir.2002). See also Beasley v. Schuessler, 519 So.2d 551, 553 (Ala.Civ.App. 1987); 5 C. Wright A. Miller, Federal Practice and Procedure § 1351 (2d ed.1990)."
Ex parte Dill, Dill, Carr, Stonbraker Hutchings,P.C., 866 So.2d 519, 525 (Ala. 2003).
 "`A physical presence in Alabama is not a prerequisite to personal jurisdiction over a nonresident: Sieber v. Campbell, 810 So.2d 641, 644
(Ala. 2001). What is required, however, is that the defendant have such contacts with Alabama that it `"should reasonably anticipate being haled into court [here]."' Dillon Equities v. Palmer Cay, Inc., 501 So.2d 459, 462 (Ala. 1986) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).
 "Depending on the quality and quantity of the contacts, jurisdiction may be either general or specific. Leventhal v. Harrelson, 723 So.2d 566, 569 (Ala. 1998). `General jurisdiction applies where a defendant's activities in the forum state are "substantial" or "continuous and systematic," regardless of whether those activities gave rise to the lawsuit. . . . A court has specific jurisdiction when a defendant has had few contacts with the forum state, but those contacts gave rise to the lawsuit.' Id.
 "But regardless of whether jurisdiction is alleged to be general or specific, the nexus between the defendant and the forum state must arise out of `"an action of the defendant [that was] purposefully directed toward the forum State."' Elliott [v. Van Kleef], 830 So.2d [726,] at 731 [(Ala. 2002)] (quoting Asahi Metal Indus. Co. v. Superior Court of California, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987))."
Ex parte Dill, Dill, 866 So.2d at 525-26.
Systrends appeals as to this issue from the trial court's denial of its postverdict motion for a judgment as a matter of law under Rule 50 or, in the alternative, a motion for a new trial under Rule 59. This Court reviews the ruling on a post-judgment motion challenging personal jurisdiction, typically asserted under Rule 60(b)(4), to determine whether the judgment against the moving party, in this case Systrends, was void for lack of personal jurisdiction. See Insurance Mgmt. Admin., Inc. v. Palomar Ins. Corp., 590 So.2d 209,212 (Ala. 1991)("The standard of review on appeal from the denial of relief under Rule 60(b)(4) is not whether there has been an abuse of discretion. . . . If the judgment is valid, it must stand; if it is void, it must be set aside. A judgment is void only if the court rendering it lacked jurisdiction of the subject matter or of the parties, or if it acted in a manner inconsistent with due process."); accord Ex parteC.L.C., 897 So.2d 234, 237 (Ala. 2004) (quoting Neal v.Neal, 856 So.2d 766, 781 (Ala. 2002)).
As noted, within a month after Brooks went to work for Systrends, the lawyer for Group 8760 wrote Systrends to advise it of the existence of the noncompetition provision in Brooks's employment agreement and to state Group 8760's opinion that Brooks's relationship with Systrends violated the terms of that noncompetition *Page 1063 
provision. In the letter, Group 8760's counsel stated his belief that "[Group] 8760 may have independent rights against Systrends for tortious interference with contractual relations." At the very least, Systrends was on notice from that time that its actions could affect an existing contract, the employment agreement, between an Alabama resident and an Alabama corporation and could precipitate litigation by Group 8760; Systrends admitted as much at trial. After receiving the letter and electing to persist in using Brooks's services over the next seven months while he continued to reside in Alabama, Systrends "should have reasonably anticipated" that its actions could result in its "being haled into court" in Alabama. DillonEquities, 501 So.2d at 462 (quoting World-WideVolkswagen Corp., 444 U.S. at 297, 100 S.Ct. 559). It was during these seven months that Brooks served as Systrends' project manager on the ERCOT project and participated in the PEPCO bid. Those activities are key features of Group 8760's claims against Brooks and Systrends.
Under these circumstances, Systrends had sufficient contacts with Alabama, contacts that gave rise to this action, to satisfy the requirements for specific personal jurisdiction. The judgment against Systrends was not void for lack of personal jurisdiction, and the trial court correctly denied Systrends' motion for a judgment as a matter of law on that basis.
 Brooks's Bankruptcy
On August 6, 2004, Brooks filed in Massachusetts a petition in bankruptcy under Chapter 7 of the United States Bankruptcy Code, listing within the "Statement of Financial Affairs" section of his petition Group 8760's pending action against him. The filing of the petition effected a stay of the action. See 11 U.S.C. § 362(a)(1). Pursuant to11 U.S.C. § 362(f), Group 8760 filed an emergency motion seeking relief from the stay. Thereafter Group 8760 and the trustee in bankruptcy, on behalf of Brooks as the debtor, entered into a stipulation, to be effective upon approval by the bankruptcy court, whereby the stay would be lifted for the purpose of allowing Group 8760 "to prosecute the Alabama Litigation in Jefferson County through the trial, and any appellate proceedings that may be necessary or desirable, or to a settlement or other resolutions, so that Group 8760 may fully adjudicate its claims in such proceedings against Debtor, thereby liquidating its claims against Debtor and his estate." The parties also stipulated that Group 8760 would seek to collect on any monetary judgment it might recover against Brooks only through the bankruptcy court. On September 2, 2004, the bankruptcy court entered an order approving the stipulations and lifting the stay. On February 2, 2005, the bankruptcy court granted Brooks a discharge pursuant to11 U.S.C. § 727. As noted, trial of the case underlying these appeals was then underway.
On February 7, as his last procedural act before resting his side of the case, Brooks offered for admission into evidence a copy of the discharge order. The trial court denied the admission of the exhibit on the ground of relevance. Brooks made no offer of proof concerning what relevance the discharge order might have to the issues to be submitted to the jury. Further, at no time did Brooks move to amend his answer to assert as an affirmative defense his discharge in bankruptcy. Although Brooks moved for a judgment as a matter of law at the close of Group 8760's case and again at the close of all the evidence, he did not on either occasion state as a ground for the motion the fact of his discharge from bankruptcy. After the trial court entered judgments on the jury *Page 1064 
verdicts, Brooks filed his "Motion for Judgment Notwithstanding the Verdict,"[2] reasserting previous grounds but also arguing for the first time that because of his discharge by the bankruptcy court, the entry of a judgment against him was not permitted. When the trial court subsequently denied that motion, it made no mention of the bankruptcy-discharge issue.
On appeal Brooks states the issue as: "Whether the trial court committed error by refusing to admit into evidence a copy of Brooks's discharge from bankruptcy and whether the trial court had authority to enter judgment against Brooks because Group 8760's claims against him had been discharged in bankruptcy, thereby necessitating a judgment for Brooks." (Brooks's principal brief, p. 1.) Brooks goes on to argue:
 "The discharge, once granted, replaces the automatic stay, acting as a permanent injunction against pursuing claims that were discharged. See 11 U.S.C. § 524(a)(2); In re Shell, 312 B.R. 431
(M.D.Ala.2004).
 "Said discharge, according to 11 U.S.C. § 524(a)(2):
 "`Operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived.'"
(Brooks's principal brief, p. 30.) Brooks argues that, consequently,
 "[t]he trial court's refusal to admit evidence of the discharge was reversible error, as was the trial court's refusal to grant Brooks' Motion for Judgment Notwithstanding the Verdict following trial. Accordingly, this Court should reverse and render judgment on Brooks' behalf on all claims because his discharge from bankruptcy is a complete defense to 8760's claims."
(Brooks's principal brief, p. 32.)
In his reply brief, Brooks asserts that he "seeks a determination of whether a copy of the discharge order is admissible to provide a basis for the affirmative defense of discharge from bankruptcy, which was already granted," arguing that he "was entitled to prove that discharge and the trial court's failure to allow him to do so was reversible error." (Brooks's reply brief, pp. 16, 19.)
Rule 8(c), Ala. R. Civ. P., governing affirmative defenses, requires that a party "set forth affirmatively . . . discharge in bankruptcy . . ." Subject to exceptions not shown to be here applicable, the affirmative defense of a bankruptcy discharge is waived if not affirmatively pleaded in accordance with Rule 8(c). Blase v. Blase, 419 So.2d 599, 601
(Ala.Civ.App. 1982); State of Alabama ex rel. State of Ohiov. E.B.M., 718 So.2d 669, 670-71 (Ala. 1998). There is no error in refusing to admit evidence relevant only to an unpleaded affirmative defense. Moreover, so far as the record reveals, Brooks did not attempt to enlighten the judge as to what relevance he thought the discharge order might have in the case. Where the relevancy of evidence is not self-evident, the proponent of it must make an offer of proof explaining its relevancy in order to preserve error. Kilcrease v. JohnDeere Indus. Equip. Co., 663 So.2d 900 (Ala. 1995);Burkett v. American Gen. Fin., Inc., 607 So.2d 138
(Ala. 1992); and Harbert v. Harbert, 721 So.2d 224
 *Page 1065 
(Ala.Civ.App. 1998). Where the evidence may be admissible for one purpose but inadmissible for another, the offeror must so specify in his offer in order to put the trial court in error.Town of Eclectic v. Mays, 547 So.2d 96 (Ala. 1989), andEnsor v. Wilson, 519 So.2d 1244 (Ala. 1987). Thus, also because he did not make an offer of proof, Brooks cannot show error in the exclusion of the proffered exhibit. See Davisv. Davis, 474 So.2d 654, 656 (Ala. 1985); Charles W. Gamble, McElroy's Alabama Evidence § 425.01(4) (5th ed.1996).
As noted, Brooks's second argument relating to his discharge in bankruptcy is that the trial court erred to reversal in refusing to grant his motion for judgment as a matter of law filed on March 11, 2005. The portion of that motion relating to Brooks's discharge in bankruptcy relied on the argument that the order of discharge superseded the order lifting the stay and consequently operated pursuant to 11 U.S.C. § 524(a)(2) as an injunction against further prosecution of the claims against Brooks. In the motion, Brooks contended that a jury verdict against Brooks was all that Group 8760 was entitled to, and the subsequent entry of judgment against him therefore exceeded the relief authorized by the order lifting the stay, so that "judgment cannot be entered." By the time Brooks's motion for a judgment as a matter of law was filed, however, judgment had in fact already been entered without prior objection by Brooks. He argued in his motion that violation of the injunction against further prosecution of the action following his discharge in bankruptcy could "result in appropriate redress by Mr. Brooks before the Bankruptcy Court pursuant to the Bankruptcy Code." As noted, the bankruptcy court had approved the stipulation that Group 8760 could prosecute its action against Brooks "through the trial, and any appellate proceeding that may be deemed necessary or desirable," and Brooks cites no specific authority in support of his contention that his discharge in bankruptcy, although presumably superseding the automatic stay, also vitiated entirely the order lifting the stay, including the court-approved stipulation. Consequently, Brooks has not shown error on the part of the trial court in denying that aspect of his motion for a judgment as a matter of law. The bankruptcy court is the proper forum for further consideration of the effect of Brooks's discharge in bankruptcy on any judgment entered against him.
 The ATSA Claims
The ATSA defines a "trade secret" as follows:
 "A `trade secret' is information that:
 "a. Is used or intended for use in a trade or business;
 "b. Is included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process;
 "c. Is not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;
 "d. Cannot be readily ascertained or derived from publicly available information;
 "e. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and
 "f. Has significant economic value."
§ 8-27-2(1), Ala. Code 1975.
The ATSA provides for the recovery of "actual damages" suffered as a result of a "misappropriation" of a trade secret, as well as exemplary damages for a willful and malicious misappropriation (§ 8-27-4); it describes "misappropriation" as follows in § 8-27-3: *Page 1066 
 "Misappropriation.
 "A person who discloses or uses the trade secret of another, without a privilege to do so, is liable to the other for misappropriation of the trade secret if:
 "(1) That person discovered the trade secret by improper means;
 "(2) That person's disclosure or use constitutes a breach of confidence reposed in that person by the other;
 "(3) That person learned the trade secret from a third person, and knew or should have known that (i) the information was a trade secret and (ii) that the trade secret had been appropriated under circumstances which violate the provisions of (1) or (2), above; or
 "(4) That person learned the information and knew or should have known that it was a trade secret and that its disclosure was made to that person by mistake."
Brooks and Systrends argue that the information Group 8760 says constituted a trade secret does not qualify as a trade secret under § 8-27-2 and, moreover, that, even if the information did constitute a trade secret, Group 8760 failed to prove by substantial evidence that they misappropriated that information.
Richard Hamilton, a software expert who has been a voting member of GISB for a number of years and who authored many of the documents constituting the GISB standards and the revisions of those standards, testified that the whole purpose of GISB was to create and publish "open standards" for ready access and use by all possible participants in electronic commerce within the natural-gas industry. He stated that he had been retained by Systrends "to examine the source code for InsideAgent, and TransactionBridge and XMLBridge [Systrends' forerunner to TransactionBridge] [and] to determine the likeness, duplication, copy, or imitation of the source code between those two products." He was to determine "the similarity of function" between InsideAgent and TransactionBridge. Hamilton testified that the sequencing of the codes in InsideAgent and TransactionBridge were "radically different because the programming languages were different" and he found no likeness in the two programs either from a lexical standpoint (scanning for similarity of phrases and words) or from a coding standpoint. According to Hamilton, the programs were also radically different from a computer-logic standpoint. Hamilton found no evidence in TransactionBridge of any use of any of the programs developed by Group 8760 during the evolution of GISBAgent. Despite an exhaustive examination of the two products, he found no similarities between them other than some similarities "that were necessitated by the GISB standards," there being "no similarities outside of those requirements." It was his opinion that "all similarities of function between InsideAgent and TransactionBridge are by necessarily [sic] in meeting the strict industry requirements and cannot be avoided." He explained that although the GISB standards do not specify the coding techniques of a GISB solution "because GISB did not want to dictate what languages or what algorithms those programs used to comply with the standards," the standards would serve to limit the algorithms or solutions that could be used for compliance. The GISB standards do govern "the essential functionality" of a GISB solution. Hamilton found that TransactionBridge represents a unique way of implementing the GISB standard, doing so in a manner that Hamilton had never before seen. Nonetheless, the GISB solutions incorporated in TransactionBridge were "kind of *Page 1067 
what I would expect from a GISB compliant program."
Hamilton's testimony on these points was undisputed, and Group 8760's only rejoinder in its brief is that Hamilton "simply compared the similarities and differences of the InsideAgent and Transaction-Bridge software" to conclude "that there is no copying of Group 8760's source code in TransactionBridge," whereas "8760 was not required to produce evidence that Systrends and Brooks copied InsideAgent in order to prove a violation of the ATSA." (Group 8760's brief, p. 56.)
Group 8760 undertook to identify the allegedly misappropriated trade secrets through the testimony of Buccigross and Williams. Buccigross estimated that it had taken approximately two years and $2 million to develop InsideAgent. Concerning the nature of the associated trade secret, he testified:
 "It's — if it was a building or an automobile, we'd be talking about blueprints, but it's almost a mental blueprint. It's a diagram of how things work. It's a process, it's procedures, it's how you handle the data, and these are not obvious things.
 "There may be a hundred different ways to do something, but only one of them works, but you don't know which one works, until you try all 100. Then you get to 100 and 101, or a 1000, and all of a sudden you say, here's what works. Now, we know how to develop and how to make this product.
 "Then when you get behind that first door, there's a whole other series of doors that you have to work at and maybe only 1 of those 100 will work. So it's — as I said, I took for the initial version, two years, if you will, to walk through all those doors and to get in the maze behind the door and figure out what was the right direction. Stops and starts. That ability to know which door to pick, which path to go down, which is the right lever to pull, how the product interacts, how the things work, that's what I believe the trade secret is, the intellectual property of 8760 is.
 "It's not the code. Anybody can write a code. It's making it do what you want it to do and then making it a product that you can sell, that people can buy, that you know will work."
Williams likewise talked in general terms in attempting to describe the trade secret allegedly misappropriated. He testified that it took approximately a year and a half and somewhere between $1 million and $2 million to create GISBAgent, the forerunner to InsideAgent. He described the trade secrets that emerged from creating that program as:
 "[I]t's the things that you learn, every day, every hour, about how do you do the things[,] how do you do the things that you do, to create the products that you've got, that you take to market.
 "It's the things that you are successful with, and it's the things you know are not successful, so that you don't waste time doing thing[s] that you know — you know your competitors are going to have to make mistakes, rather than know exactly what to do to begin with.
 "If you walk out the door with a trade secret, you can do something in a tenth of the time that you have to spend if you are doing for the first time, within your own company."
Counsel for Brooks pressed Williams during cross-examination to be more specific in his identification and description of the trade secret he alleged Brooks had misappropriated:
 "Q. [W]hat I need to know is exactly what it is you're claiming Dick Brooks stole from you, okay? . . . *Page 1068 
 "A. Dick Brooks, took from 8760 the knowledge about our processes.
 ". . . .
 "Q. What trade secrets do you say Mr. Brooks stole?
 "A. . . . .
 "Dick knew every one of our company's systems. We programmed on many different types of systems, deck systems, Hewlett Packard systems, IBM systems[,] Microsoft systems, the ability to write code that operates on a lot of systems, and then can be installed quickly as a stand alone product, is a trade secret.
 "Q. Ability to write code, and which systems did he steal that ability in reference to?
 "A. I think what we end up with is that Dick knew the blueprint that we ended up with after writing an application that would run on unique systems.
 "Q. Which application?
 "A. InsideAgent.
 "Q. So, the ability to write code. So is the ability to any code, or the ability to write just InsideAgent?
 "A. No, the ability to write InsideAgent type code that executes InsideAgent's functionalities.
 "Q. Okay. So, are you talking about InsideAgent itself?
 "A. Well, that's our product, yes.
 "Q. Right. What is . . . the trade secret that you said Dick Brooks stole — the ability to write InsideAgent?
 "A. That's one of the things.
 "Q. Okay. So we've got the ability to write code and we've got the ability to write InsideAgent. Am I right so far?
 "Q. Okay. What else?
 "A. Well, compilations — we don't want to get into that, its highly technical, but —
 "Q. Well, is it a part of what you're saying Dick Brooks stole from you?
 "A. Well, it's one of the things he learned how to do with regard to InsideAgent. . . .
 "Q. Well, if we're here about a lawsuit against Mr. Brooks for stealing things, I think we need to know what he's accused of stealing. So, if you're accusing him of stealing some of your compilations, I need to know what they are?
 "A. When you write code or when you assemble a body of information, you compile things. Those end up being called compilations.
 "Q. Right. Any particular compilations you can name for the jury, that Mr. Brooks stole from your company?
 "A. Yes.
 "Q. Which one?
 "A. The information about how to write a product that can be installed quickly, that performs all the functions of InsideAgent.
 "Q. Okay. Well, you were talking about compilations and now you're back to the ability to write code. Are we —
 "A. Well, the compilations contain the information required to write InsideAgent.
 ". . . .
 "Q. Okay.
 "So, have we exhausted the compilations part?
 "A. I guess so.
 ". . . .
 "Q. What about methods?
 "A. Well, the method — when you write software, if you had done something before, and you want to create a product that is going to perform the same functions basically, as a product that you have worked on previously, you *Page 1069 
use the same, probably devices, methods, techniques, processes, and procedures. You know which ones to use and you know which ones not to use.
 "And I believe that he used all those things to help create the product that ended up being call[ed] TransactionBridge.
 "Q. So, the lessons he learned from experience are 8760's trade secret?
 "A. Yes, with specific regard to the development of InsideAgent, that's correct. . . . [W]hen you develop a product as well received and successful as InsideAgent, and then you go somewhere else, and you work on a product that ends up being relatively the same, it is my opinion that you would use the same devices, methods, techniques, processes, and procedures, or you'd be an idiot.
 "Q. So, it's the lessons he learned through trial and error, right?
 "A. Yes.
 ". . . .
 "Q. So, his experience as a programmer for 8760, is a trade secret of 8760?
 "A. His and everyone else that reported to him. . . ."
Challenged by Brooks's counsel at a later point to "put on evidence for the jury, of what you contend Dick Brooks stole," Williams continued:
 "A. And the things that are within his experience that are trade secrets to me, are with specific regard to creating the product InsideAgent. He knew all of the following: Methods, techniques, processes, procedures, he knew what computer software to use, he knew what the mistakes that had been made were, he knew what the successes were. All of that experience within the context of being used with InsideAgent, okay, are trade secrets.
 ". . . .
 "Q. And just intangibly saying, well, it's methods, it's devices, it's processes. Until we know exactly which method, and which process, and which device —
 "A. Okay. Let me say it this way. See if this helps you. The devices, methods, techniques, processes, procedures, all of those things that allow you to create a product like InsideAgent, which were garnered at 8760, are those things that I know —
 "Q. Okay.
 "A. Dick took to Systrends and helped them create TransactionBridge product.
 "Q. What process that is unique to 8760 that's not known or used by other software companies, did Dick Brooks steal from your company?
 "A. I'm not saying that our processes are any different than anyone else's in the general. In the specific, the fact that you do it to create a specific product like InsideAgent, it's different than [the] process going on anywhere else.
 ". . . .
 "Q. But what we've got so far, I think Mr. Williams, is just an intangible list. You're saying he stole processes, devices, methods, techniques, and we haven't heard what they are.
 "A. I think I've tried to do my best to tell you what they are. I've tried to answer that question. Maybe I'm not doing a very good job, but I've told you several times now, that the methods, techniques, processes, procedures, that you use in specifically, not generally what's used in the industry.
 "Q. Right.
 "A. I agree that programmers use similar techniques in similar places, but when you specifically use those processes, to develop a specific product like InsideAgent, you learn specific things, *Page 1070 
and you learn specific processes, specific methods, specific techniques, and procedures, and that is what I am alleging —
 ". . . .
 "Can you name a software company that doesn't design software this way?
 "A. I don't, I would assume that most do, but maybe people just sit down and write. I have no idea.
 "Q. Okay. But this is the process you contend was a trade secret of 8760 that Dick Brooks stole?
 "A. No, the process is not what I claim he stole. What I claim he stole was the experience within that — the specific experience of having gone through the process, in the specific of the product InsideAgent, which looks a lot like TransactionBridge."
At various other points during his testimony Williams attempted further to describe the trade secret he alleged had been misappropriated, but in each instance resorted to similarly generalized characterizations. In its brief to this Court, Group 8760 continues to invoke somewhat amorphous concepts concerning its trade secret, arguing that it "was the `process' — the know how' — of creating InsideAgent" (Group 8760's brief, p. 52), arguing that "Brooks learned the process for creating and developing InsideAgent. His `know how' of this process — as opposed to the general knowledge he acquired about GISB or computer language while working at 8760 — is what is protected by trade secret law and is what he was prohibited from disclosing or using."
Group 8760 bore the burden of proving, by substantial evidence, that Brooks and Systrends were guilty of an actual misappropriation, as defined by the ATSA. Group 8760's theory of the misappropriation, as pleaded in its last amended complaint, as described by Williams in his trial testimony, and as delineated by the trial judge during his jury instructions, related exclusively to the alleged use by Systrends of Brooks's knowledge of the process of creating InsideAgent in the development of Systrends' TransactionBridge product. Group 8760's attempts to prove that claim were in the form of opinions expressed by Buccigross and Williams and inferences Group 8760 sought to have witnesses draw from the contents of certain e-mails placed in evidence. Buccigross, however, could not identify any particular Group 8760 trade secret used to develop TransactionBridge and, after admitting that he had no personal knowledge of how TransactionBridge was designed, developed, or operated, could only answer, when asked how he could say that anything out of InsideAgent had been used in TransactionBridge, "I'm telling what I feel in my heart." Williams, for his part, acknowledged that there was no contention that Brooks had taken with him any Group 8760 files, software, books, or literature but speculated that
 "[w]hen you develop a product as well received and successful as InsideAgent, and then you go somewhere else, and you work on a product that ends up being relatively the same, it is my opinion that you would use the same devices, methods, techniques, processes, and procedures, or you'd be an idiot."
 Similarly, Williams opined:
 "[B]ecause obviously they did create a product that competes with us, and Dick and Casey [Payne] were involved, and I think that shows — I think that evidence shows, that these trade secrets were taken from us where we used them at 8760 to create InsideAgent, and they were taken to Systrends, and now — they didn't have a product like ours before Dick went over there, and now they do — it looks like — if [it] looks like a duck, and walks like a duck, it's probably a duck." *Page 1071 
Group 8760 argues in its appellate brief that Williams "testified that InsideAgent and TransactionBridge were identical in terms of providing a GISB solution and shared numerous similar components," citing two segments of Williams's testimony. (Group 8760's brief, p. 54.) All Williams actually said in those referenced instances, however, was that both InsideAgent and TransactionBridge performed many of the same functions, while acknowledging that they differed in various other functions. When challenged to point to any evidence, apart from a reference in an e-mail to "RoboBB" (to be addressed later in this opinion), that anything from InsideAgent had been used from a programming or architectural or design standpoint in the TransactionBridge product, Williams responded only that he could compare what Systrends said on its Web site about what TransactionBridge did "and we could look at what GISBAgent does, and they are very, very similar. Now if you are saying code — I don't expect the code to look the same." He went on to acknowledge that there was no evidence indicating that Systrends used any GISBAgent code and "no evidence that any of the architecture of GISBAgent was used in TransactionBridge."
In addressing the lack of any direct evidence of misappropriation of trade secrets used in creating InsideAgent in connection with the development of TransactionBridge, Group 8760 argues in its brief:
 "Of course, 8760 does not have a snapshot or video recording of Brooks disclosing his knowledge of the `process' to Systrends. But what 8760 does have is an e-mail showing Brooks talking to Casey Payne about one aspect of this process — the RoboBB component of InsideAgent. (Px. 216) There, Brooks instructs Payne to refer to the method by which they, when working for 8760, created the RoboBB component of InsideAgent and utilize it when developing TransactionBridge. This specific `know how" regarding the creation of RoboBB was trade secret protected, which Brooks and Systrends violated."
(Group 8760's brief, pp. 53-55; references to the record and a footnote omitted.)
The e-mail in question, introduced as plaintiff's exhibit 216, consisted of an inquiry by Casey Payne to Brooks on January 31, 2002, referencing a "GISB question" and Brooks's reply. Payne's e-mail to Brooks read:
 "I have two more quick questions regarding the error notifications that are sent back to the client. This happens after the server receives the client's request msg., and after the connection is closed. After the decryption processing, if any errors happen, the server makes a connection back to the client's server to send the error message. Is this correct? Also, as far as determining whether the error notification will be digitally signed, this will have been previously determined and we will know of this part of the TPA as it will be stored in the DB. Is this correct?"
Brooks's response, e-mailed to Payne later that same day, answered Payne's first question by stating: "Yes. The error message is actually placed in the outbound `queue'/directory and at the next interval the file will be sent (remember RoboBB. . .)."
Williams contended during his direct testimony that Brooks's reference to RoboBB was intended to remind Payne how a piece of Group 8760 software performed the error-notification function. On cross-examination, however, Williams acknowledged that the GISB standards themselves spoke to how error messages were done, and when asked if Payne's question in that regard was not actually asking about GISB *Page 1072 
standards, Williams answered, "I'm not sure if it is just about the standards or not." "I think there may be more than that, but I'm not going to say that." Williams did acknowledge that "[t]he error notification is part of the standard" and that "encryption and decryption are required" by the standard. Williams described RoboBB as a piece of code Group 8760 had developed to serve as a "batch browser" that performed various functions, but he explained:
 "I am not a programmer, I mean I did some programming, but I didn't program that code. I only know of RoboBB through hearing the term and observing our developers using RoboBB. I did not write it. . . . I am not a programmer, I just know that RoboBB is something that Group 8760 programmers developed while Dick and Casey were at 8760 and it is an important part of GISBAgent and InsideAgent."
Williams expressed the opinion that "knowing how to write RoboBB, having written it, the process you went through, the architecture you went through, the road you went down, all of that is important. And that is a trade secret, knowing how to do it is a trade secret."
Williams did not claim, however, that the task RoboBB performed represented a trade secret. Further, he acknowledged that he had no information indicating that any part of the RoboBB code had been used in any way by Systrends or that it appeared in any form in TransactionBridge, explaining that he had not seen the code for TransactionBridge. In the end, he summarized his argument about what the January 31, 2002, e-mail exchange between Williams and Brooks revealed, by stating: "All I know, is that from this e-mail, Dick is telling Casey, remember how we did it at Group 8760 with InsideAgent. Do the same way in TransactionBridge or GISB EDM for ERCOT. Whenever, this is January, this would have been GISB EDM for ERCOT." Of course, because Payne was already fully familiar with the process involved in the development of RoboBB, the reference to that code by Brooks would not involve a "disclosure" of it. When Williams was asked what evidence he had that Systrends used RoboBB in developing TransactionBridge, given that the GISB standards necessitated employment of a batch browser and there was no evidence indicating that RoboBB's code or architecture had been used in TransactionBridge, he answered only, "I would say the e-mail is the evidence."
Group 8760 relies on the cumulative effect of inferences it says are derivable from that e-mail and other e-mails to argue that the jury "could have reasonably inferred that Brooks disclosed and Systrends used 8760 trade secrets in the creation of the TransactionBridge software." (Group 8760's principal brief, p. 55.) For example, Williams referenced during his testimony a January 13, 2002, e-mail inquiry from an IBM global-services consultant to Brooks at Systrends, inquiring "does Systrends now have product(s), like GISBAgent?," and Brooks's reply, "the answer is, not yet; -)." According to Williams, that answer represented "a wink and a smile in Internet jargon. I could not believe that. To me, this means, we are going to have it pretty soon. That's what we're work[ing] on." Williams also pointed to an e-mail Brooks sent to a Systrends official upon being advised by him on December 21, 2001, that PEPCO had chosen Systrends "IP NetSolution" over Group 8760's product, in which Brooks stated that if the PEPCO executive in question "likes GISBAgent. He's going to LOVE XMLbridge version 2.0." Williams opined, "it looks to me like Dick is saying, I know what GISBAgent is like, and you know, *Page 1073 
he's going to love XML version 2.0 because it's just like it. If he is working with Systrends and he is comparing the two — then he is talking about our trade secrets."
We have examined all of the e-mails in question and have considered the inferences counsel for Group 8760 sought to have various witnesses draw from them, and we cannot agree that those e-mails, individually or collectively, or in conjunction with any of the other evidence relied on by Group 8760, constitute substantial evidence establishing Group 8760's claim that Systrends in fact used trade secrets of Group 8760 in creating the TransactionBridge software.
Group 8760 also argues in its brief that "Brooks and Systrends' willingness to hide the most crucial evidence supporting 8760's claims creates [a reasonable] inference of misappropriation." (Group 8760's brief, p. 55.) Group 8760 correctly notes that this Court held in May v. Moore, 424 So.2d 596, 603
(Ala. 1982), that "the spoliation, or attempt to suppress material evidence by a party to a suit, favorable to an adversary, is sufficient foundation for an inference of his guilt of negligence." (Group 8760's brief, p. 42.) The evidence Group 8760 says Brooks and Systrends attempted to hide consisted of some documents and e-mails the attorney for Group 8760 suggested during his questioning of Brooks and Darnell had not been produced by them as a part of their responses to properly served document-production requests. When the attorney questioned Brooks about four of the items Group 8760 now argues were withheld, Brooks explained that if the document-production request to which the attorney was referring (the content or date of which are not identified in the trial record) had been sent to Brooks after April 2003, he would not have had certain of the documents in his possession because he left Systrends' employ that month. Brooks also explained that it was his understanding that the documents being sought belonged to Systrends and that he was not authorized independently to disclose them, but that he would have assumed that Systrends would have produced them. Moreover, Brooks pointed out that at least one of the e-mails in question had been distributed to the Texas Data Transport Work Group, of which Buccigross was a member.
Darnell was questioned concerning only three e-mails Group 8760 says he withheld from discovery, the same ones about which Brooks had been questioned. When counsel for Group 8760 suggested that Darnell had not produced those materials to Group 8760, Darnell responded:
 "I don't really know. We gave you 22,000 pages or something of documents. Now, we told you we weren't going to give you the documents that went to the list serve, that you guys were on the list serve, TDTWG [Texas Data Technology Working Group]. There were like 20,000, 40,000 pages that went to that. So, you know these documents, I believe were sent to TDTWG.
 ". . . .
 "I know for a fact that these, at least this one, went to the TDTWG, because this was the spec that Dick did, and we told you that we weren't going give you all those whatever million pages that were on that list and besides, Jim Buccigross was on the list serve, so you already had them."
When counsel for Group 8760 challenged Darnell on the basis that he could not state under oath that he had given the e-mails to Group 8760, Darnell answered:
 "Well, that's true because, what I did, I told my person that works in e-mail to print out those 22,000 pages and give them to you. I didn't print them out. I didn't look at them. But I know for a *Page 1074 
fact, that you should have got them. And this particular one went to ERGOT and a lot of people at ERGOT had it. So, it wasn't exactly Systrends only. It was for ERGOT and they spread it out amongst themselves."
All that Group 8760 presented in opposition to these explanations was the testimony of Williams that he had gone through the approximately 22,000 documents produced by Systrends and had not found among them the three e-mails about which Brooks and Williams were questioned.
If the evidence warrants, a trial judge may properly charge a jury in a civil case, using Alabama Pattern JuryInstructions: Civil, 15.13, that if the jury is reasonably satisfied from the evidence that the defendant "did or attempted to wrongfully destroy, hide, conceal, alter, or otherwise tamper with material evidence, then that fact may be considered as an inference of defendant's guilt, culpability, or awareness of the defendant's negligence." Group 8760 submitted to the trial judge a requested jury charge that would have advised the jury that if it found "that a party willfully suppressed[,] hid or destroyed evidence in order to prevent its being presented in this trial, [it] may consider such suppression, hiding or destruction, in determining what inferences to draw from the evidence or facts in the case." The judge declined to give the charge or to incorporate its substance into the oral charge, and the jury was not otherwise instructed in any fashion that it might infer guilt or culpability on the part of either Brooks or Systrends if it found that either or both of them had wrongfully hidden or concealed material evidence or had attempted to do so. For all that appears, the trial judge was not satisfied that sufficient evidence had been adduced, as opposed to argument of counsel, that Brooks or Systrends had attempted wrongfully to hide or conceal the items in question. At any rate, the jury was not instructed that it could draw any adverse inference from any deficiencies in the document-production responses of Brooks and Systrends; consequently, Group 8760 cannot now shore up its evidentiary presentation by arguing such an inference.
The trial judge properly charged the jury that it might draw reasonable inferences from the facts established by the evidence, but that "the inference may not be based upon another inference. In other words, you can't have one inference and you base an inference on that inference."
"`Evidence . . . which affords nothing more than mere speculation, conjecture, or guess is insufficient to warrant the submission of a case to the jury.' Sprayberry v. FirstNat'l Bank, 465 So.2d 1111, 1114 (Ala. 1984)." Finleyv. Patterson, 705 So.2d 826, 830 (Ala. 1997).
 "An `inference' is a reasonable deduction of fact, unknown or unproved, from a fact that is known or proved. See, Malone Freight Lines, Inc. v. McCardle, 277 Ala. 100, 167 So.2d 274 (1964). `[A]n inference cannot be derived from another inference.' Malone, 277 Ala. at 107, 167 So.2d at 281. An inference must be based on a known or proved fact. Id."
Khirieh v. State Farm Mut. Auto. Ins. Co.,594 So.2d 1220, 1224 (Ala. 1992).
The inferences on which Group 8760 seeks to rely in arguing that it presented substantial evidence indicating that Systrends used Group 8760 trade secrets involved in creating InsideAgent to develop Systrends' TransactionBridge software are not reasonably derivable from the facts in evidence, but rather impermissibly require that inferences be based upon inferences. As previously noted, uncontradicted testimony established the absence of similarities between Group 8760's InsideAgent *Page 1075 
software and Systrends' TransactionBridge software except for matters clearly within the public domain. In the final analysis, Group 8760 did not carry its burden of proving by substantial evidence the particular claim it made under the ATSA, that Systrends used trade secrets of Group 8760, which evolved during the development of InsideAgent, to create TransactionBridge.
Brooks and Systrends each properly asserted that failure of proof in moving for a judgment as a matter of law at the conclusion of the plaintiff's case and again at the conclusion of all the evidence.
Brooks and Systrends each thereafter reiterated that ground in their respective renewed motions for a judgment as a matter of law filed after entry of judgment. That ground was well taken, as explained above, and the motions for judgment as a matter of law should have been granted with respect to Group 8760's claims asserting that Brooks and Systrends had violated the ATSA. Consequently, we reverse the judgments to that extent and remand the case for the entry of judgments in favor of Brooks and Systrends on Group 8760's claims against them based on misappropriation of a trade secret.
Because of this disposition, we need not consider Brooks and Systrends' separate argument that Brooks's knowledge and "know how" of the process of creating and developing InsideAgent would not constitute a trade secret under the ATSA. Also, because the appeal by Group 8760 argues only that the trial judge erred in declining to grant it a permanent injunction against Systrends pursuant to § 8-27-4(1)a. of the ATSA and attorney fees as the prevailing party on its ATSA claim under § 8-27-4(2), our holding as to that claim warrants affirmance in Group 8760's appeal.
 Requirement of Proof of Damages
To sustain its remaining claims of breach of fiduciary duty and breach of contract against Brooks and tortious interference with contract against Systrends, Group 8760 was required to prove, among other things, the damages resulting from those civil wrongs.
 "A claim alleging breach of fiduciary duty sounds in tort, Brooks v. Hill, 717 So.2d 759, 764
(Ala. 1998), and `[a] necessary element to be proven in an action alleging breach of duty is damages.' Williams v. Citizens Nat'l Bank of Shawmut, 570 So.2d 635, 638 (Ala. 1990). Also, an essential element of a claim of tortious interference is damages. Parsons v. Aaron, 849 So.2d 932, 946
(Ala. 2002)."
Hensley v. Poole, 910 So.2d 96, 106 (Ala. 2005). See also Serra Chevrolet, Inc. v. Edwards Chevrolet, Inc.,850 So.2d 259, 265 (Ala. 2002) (damages as element of tortious interference claim); Utah Foam Prods., Inc. v. Polytec,Inc., 584 So.2d 1345, 1352-53 (Ala. 1991) (same).
Damages for breach of contract "`"`should return the injured party to the position he would have been in had the contract been fully performed.'"'" Parsons v. Aaron,849 So.2d 932, 949 (Ala. 2002) (quoting other cases). Although they need not be proved to a mathematical certainty, "damages [for breach of contract] may not be awarded where they are remote or speculative. A jury must have some reasonable basis for the amount of its award." Parsons,849 So.2d at 949. See also Ricwil, Inc. v. S.L. Pappas Co.,599 So.2d 1126, 1132 (Ala. 1992).
 "It is true that damages may be awarded only where they are reasonably certain. Damages may not be based upon speculation. Industrial Chemical Fiberglass Corp. v. Chandler, 547 So.2d 812
(Ala. 1988); see also Alabama Power *Page 1076 Co. v. Alabama Public Service Commission, 267 Ala. 474, 103 So.2d 14 (1958). . . . [The plaintiff] `must produce evidence tending to show the extent of damages as a matter of just and reasonable inference.' C. Gamble, Alabama Law of Damages § 7-1 (2d ed.1988), as cited in Industrial Chemical, supra, at 820. The rule that one cannot recover uncertain damages relates to the nature of the damages, and not to their extent. If the damage or loss or harm suffered is certain, the fact that the extent is uncertain does not prevent a recovery. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544
(1931); see also Shook v. Vertagreen Credit Union, 460 So.2d 1343 (Ala.Civ.App. 1984)."
Jamison, Money, Farmer Co. v. Standeffer,678 So.2d 1061, 1067 (Ala. 1996). See also Birmingham News Co.o. Horn, 901 So.2d 27, 65 (Ala. 2004) (damages for lost profits based upon tort claim are recoverable if proved with reasonable certainty). When a plaintiff fails to demonstrate damage or injury attributable to the defendant's breach of contract or tortious act, a judgment awarding damages should not stand. See, e.g., Hensley v. Poole, supra,Parsons v. Aaron, supra.
Group 8760's evidence concerning the extent of its damages came solely from Williams and Group 8760's expert witness, Steven Dauphin. Williams's testimony was essentially that as of a July 16, 2001, "consulting agreement" with Dauphin, Williams had valued Group 8760 at $3,000,000, whereas in a March 26, 2004, proposal to an interested company on how it could earn "options for ownership" in Group 8760, he had valued Group 8760 at only $1,100,000. Williams confirmed that those figures represented his judgments as to the value of Group 8760 as of those times. He considered its value at the time of trial to be "basically zero." Williams attributed the decrease in Group 8760's value from $3,000,000 in July 2001 to $1,100,000 in March 2004 to "Systrends activities in the market place," causing Group 8760 to lose one or two contract bids and impairing its ability to raise money, and to "what went on with Mr. Brooks and Systrends," with "the primary, by far the biggest" damage coming from the fact that Brooks "left and [took] our trade secrets and competed with us." Williams admitted, however, that Group 8760 had lost none of its existing customers. Asked if he had ruled out the various other causative factors that might have caused a decline in the value of Group 8760, Williams responded:
 "Well, I'm not talking about the methodology. I'm talking about the establishment of the valuation based on specific tangible transactions at points in time. Mr. Dauphin will talk to you about the methodology that he used for showing the damages based on those two numbers, and the extrapolation and formulas that we used."
Dauphin, in turn, agreed with Williams's estimate of a $3,000,000 value for Group 8760 just before Brooks's departure, having been involved in the negotiations with Williams that gave rise to the July 2001 consulting agreement. (Using that as a base figure, and projecting an annualized growth rate of 41.2% as the growth Group 8760 could have expected to experience but for the actions of Brooks and Systrends, Dauphin estimated that Group 8760 could have achieved a value of $10,100,000 as of the time of trial. He also adopted the $1,100,000 value figure Williams derived from the March 2004 proposal, but used it as representing the best estimate of the company's value as of trial. Comparing his projected value of $10.1 million to the $1.1 million value at trial, he arrived at this damages estimate: "I believe it's reasonable to assign the difference between $10.1 *Page 1077 
and $1.1 of nine million as damages in this case."
Brooks and Systrends assail Dauphin's assumptions and methodology on a number of fronts, particularly with respect to his utilization of a growth rate he based solely on an index published by a third party for totally different uses and the components of which Dauphin did not know. We need not resolve those issues, however, because even if we accept Dauphin's damages estimate without reservation, it does not supply the evidence Group 8760 was required to present to establish its damages associated with its separate claims. In that regard, we find the following testimony by Dauphin determinative in our subsequent discussions:
 "Q [Counsel for Brooks]. So, are you saying that Dick Brooks and Systrends did in fact, cause 8760's financial problems?
 "A. They were a huge part of their financial problems.
 "Q. Okay. Can you say they were the single biggest impact?
 "A. I would say they were the biggest single impact.
 ". . . .
 "Q. Can you say that they're 50 percent of the cause?
 "A. I would think and again I think the best estimate is that the nine million dollars in loss is attributable to the actions of Systrends and Mr. Brooks, because I believe other than that, the company conducted itself very well through that period of time which in this industry was not a period of calamitous events."
 ______
 "Q [Counsel for Brooks]. The different components of the actions that Dick Brooks and Systrends are accused of — some of them you just mentioned, PEPCO, ERCOT, the noncompete, the non-solicitation, the trade secrets, you can't break up your nine million dollar figure into which action caused which portion of those damages, can you?
 "A. No.
 "Q. So, if the jury in this case were to decide in favor of 8760 on some of those claims, and in favor of Dick and Systrends on some of those claims, you can't give them any guidance about how that affects the damages, can you?
 "A. I can't specify a particular dollar amount for a particular action."
Group 8760 argued to the trial judge during postjudgment hearings that if all of the compensatory-damages awards were added up, "this jury almost hit nine million dollars exactly," awarding "almost nine million dollars worth of compensatory damages, but they split it up based upon what they thought Brooks did and what they thought Systrends did." We need not consider whether the total damages figure supplied by Dauphin would support the aggregate of the separate verdicts if we were to uphold all of the verdicts. What we must address is whether, under the principles discussed above and given our invalidation of the amounts awarded for alleged ATSA violations by Brooks and Systrends, the separate amounts the jury awarded for Brooks's alleged breach of fiduciary duty and breach of contract and Systrends' alleged tortious interference with contract are sustainable under the evidence presented. Brooks and Systrends properly raised and preserved this issue in their respective motions for a new trial, and they have each properly argued it in their appellate briefs. (Brooks's principal brief, pp. 75-77; Systrends' principal brief, pp. 62-64.)
 Breach-of-Fiduciary-Duty Claim Against Brooks
Williams testified that after his August 2001 confrontation with Brooks *Page 1078 
about his job interview with Sterling, Williams learned that the interview had "wrecked the possibility of any further talks about acquisition." Mark testified that Brooks had betrayed Group 8760 by interviewing for a job with Sterling, pursuing only his own best interests, or "[w]hat was best for Dick."
 "It is an agent's duty to act, in all circumstances, with due regard for the interests of his principal and to act with the utmost good faith and loyalty. Williams v. Williams, 497 So.2d 481
(Ala. 1986). Implicit in this duty is an obligation not to subvert the principal's business by luring away customers or employees of the principal, or to otherwise act in any manner adverse to the principal's interest. See Naviera Despina, Inc. v. Cooper Shipping Co., 676 F.Supp. 1134 (S.D.Ala.1987)."
Allied Supply Co. v. Brown, 585 So.2d 33, 37
(Ala. 1991). In paragraph 6 of his employment agreement with Group 8760, Brooks committed that he would "not directly or indirectly, engage or participate in any activities at anytime during the term of this Employment Agreement in conflict with the best interests of [Group 8760]."
The jury was entitled to conclude from the evidence presented, drawing reasonable inferences adverse to Brooks, that he had surreptitiously interviewed with Sterling for a job, knowing that any interest it might have in acquiring Group 8760 would thereby be undercut, thus representing bad faith on his part in not acting in the best interests of Group 8760. Williams's testimony established that Brooks's actions in that regard had sabotaged further-talks with Sterling about the possibility of its acquiring Group 8760.
The totality of this evidence was substantial evidence indicating that Brooks had breached a fiduciary duty he owed Group 8760 and that it was damaged as a result. Moreover, the only argument Brooks offered in support of his motion for a judgment as a matter of law after Group 8760 rested with respect to this claim was that because Group 8760 was an Alabama limited liability company, it was "governed by the Alabama LLC Act" and by its own operating agreement and "[t]he duties incumbent on the people involved in the LLC flow if anywhere from those two sources." Brooks went on to argue that the Alabama Limited Liability Company Act governs the duties of only members and managers of the limited liability company, and that because Brooks was neither a member nor a manager of Group 8760, there was no fiduciary duty imposed on Brooks under the Act. Consequently, Brooks contended, because the only fiduciary duty alleged in the complaint to have been breached by Brooks was that owing by him as an employee, "[t]here is no source of a duty. If there is no source of a duty, there can be no breach of that duty." Id. This argument, repeated on appeal, was not well taken because, as noted, under the principles stated in Allied Supply Co., supra, a duty to act in good faith flows from an agent to his principal and, in this particular case, a duty also flowed from Brooks to Group 8760 under his employment agreement not to act in conflict with the best interests of Group 8760. When Brooks renewed his motion for a judgment as a matter of law at the close of all the evidence, he simply relied on the same grounds he had previously asserted as to this issue, except to state in passing, "there is no duty — fiduciary duty on Mr. Brooks in the situation as an employee." Therefore, Brooks's only ground for his motion for a judgment as a matter of law as to the breach-of-fiduciary-duty claim was that he owed, as anemployee, no fiduciary duty, and, that ground not being well taken under particular facts of this *Page 1079 
case, the trial court did not err in denying that motion.
The trial judge charged the jury as follows concerning the breach-of-fiduciary-duty claim:
 "The term `fiduciary duty,' refers to the nature of the legal obligation which a corporate officer or employee owes to his employer. The fiduciary duties imposed upon an agent is a duty to act in all circumstances with due regard for the interest of his employer, in this case, Group 8760, and to act in good faith, loyalty, and fair dealing towards his employer.
 "One under a fiduciary duty cannot place himself in a position that is antagonistic to his employer and must not utilize his position to favor himself or some third party in whom he might be materially interested to the detriment of his employer. As long as he is acting as an agent or employee, the relationship exists. A fiduciary duty can be modified by an expressed agreement between the employer and the employee.
 "You must determine whether Mr. Brooks' conduct at Group 8760 demonstrated a breach of his fiduciary duties to Group 8760 [and] if you find that Mr. Brooks, through his dealing with Sterling Commerce, failed to uphold any fiduciary duty upon him, then you should find for Group 8760 on his claim of breach of fiduciary duty."
Brooks's only objection to that portion of the charge was that he took "exception to that portion of the charge that characterized Dick Brooks as a corporate officer under the breach of fiduciary duty claim. That claim is against him as an employee of an L.L.C. He is not a corporate officer." This comment did not preserve the error Brooks now contends occurred, and the charge became "the law of the case," binding on the jury. Alabama Dep't of Transp. v. Land Energy,Ltd., 886 So.2d 787, 795 (Ala. 2004).
There was no evidence provided, however, from which the jury could quantify the resulting damages in monetary terms or intelligently estimate what percentage or proportion of Dauphin's $9 million "lump sum" damages figure might justifiably be attributed to Brooks's breach of his fiduciary duty. The compensatory damages the jury assessed for that breach were in the relatively precise amount of $252,500. No testimony or other evidence in the record suggests that amount, or anything in that range, as resulting from Brooks's breach of his fiduciary duty. Coincidentally or not, however, the jury did hear evidence that during the negotiations looking toward Brooks's possible resignation, he refused to waive the right he otherwise had under Group 8760's operating agreement to receive $252,500 as a priority distribution out of any proceeds resulting from a sale of Group 8760, even though all of the other Group 8760 partners were willing to forgo that right to promote a sale of the company. There is no conceivable connection under the evidence between Brooks's unwillingness to relinquish that contractually specified amount and the alleged breach of his fiduciary duty.
There being no evidentiary basis for the compensatory damages awarded for Brooks's breach of his fiduciary duty to Group 8760, his motion for a new trial making that point was due to be granted, and its denial constituted reversible error. Because the compensatory-damages award has been eliminated, the punitive damages awarded on this claim must also be vacated.Mobile Infirmary Med. Ctr. v. Hodgen, 884 So.2d 801
(Ala. 2003); and Life Ins. Co. of Georgia v. Smith,719 So.2d 797 (Ala. 1998). Consequently, we reverse the judgment as to the claim against Brooks *Page 1080 
alleging breach of fiduciary duty and remand the case for the entry of an order granting a new trial as to that claim.
 Breach-of-Contract Claim Against Brooks
Brooks and Systrends argue that the trial court erred in denying their motion for a judgment as a matter of law as to the validity of the noncompetition provision.[3] They argued to the trial court that the provision did not designate a specific location within which the restrictions in that provision would apply and that it thus was not reasonably limited in scope. They further asserted that even if the trial court applied the definition in the provision of Group 8760's "territory" as "the entire world," the scope was still unreasonable and the provision void.
Alabama Code 1975, § 8-1-1, states in relevant part:
 "(a) Every contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by this section is to that extent void.
 "(b) One who sells the good will of a business may agree with the buyer and one who is employed as an agent, servant or employee may agree with his employer to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a specified county, city, or part thereof so long as the buyer, or any person deriving title to the good will from him, or employer carries on a like business therein."
 We have stated that Alabama courts
 "will enforce a covenant not to compete that fits within the exception of § 8-1-1(b) only if:
 "`1. the employer has a protectable interest;
 "`2. the restriction is reasonably related to that interest;
 "`3. the restriction is reasonable in time and place; [and]
 "`4. the restriction imposes no undue hardship [on the employee].'
 "DeVoe v. Cheatham, 413 So.2d 1141, 1142
(Ala. 1982)."
Clark v. Liberty Nat'l Life Ins. Co., 592 So.2d 564,565-66 (Ala. 1992). A noncompetition agreement may "`properly include part of Alabama, all of Alabama, or "more territory than the State of Alabama," depending on the circumstances.'"Id. at 566 (quoting James S. Kemper Co. v.Cox Assocs., Inc., 434 So.2d 1380, 1385 (Ala. 1983)) (footnote omitted). See also Clark, 592 So.2d at 566
n. 2; Central Bancshares of the South, Inc. v.Puckett, 584 So.2d 829 (Ala. 1991); James S. Kemper Co. v. Cox Assocs., Inc., supra; andParker v. EBSCO Indus., Inc., 282 Ala. 98,209 So.2d 383 (1968).
In paragraph 19 of their motion, Brooks and Systrends acknowledged that Alabama courts may restrict overly broad provisions of agreements in restraint of trade and instead enforce reasonable limitations as to location. We recently recognized:
 "`An agreement in restraint of trade may be divisible. An unreasonable limitation or restriction may be stricken. . . .' Cullman Broad. Co. v. Bosley, 373 So.2d 830, 835 (Ala. 1979). Furthermore, `a court of equity has the power to enforce a contract against competition although the territory or period may be unreasonable, by granting an injunction restraining the respondent from competing for a reasonable time and within a reasonable area.' Mason Corp. v. Kennedy, *Page 1081 286 Ala. 639, 645, 244 So.2d 585, 590 (1971)."
King v. Head Start Family Hair Salons, Inc.,886 So.2d 769, 772 (Ala. 2004). As noted earlier, the agreement between Brooks and Group 8760 states, in relevant part, that if any provision relating to the geographical area of the restriction should be judicially declared to exceed the maximum geographical areas deemed reasonable by the court, the geographical area deemed reasonable and enforceable by the court would be the maximum geographical area. By the parties' agreement, therefore, the trial court had additional authority to limit the scope of the restrictive covenant.
On appeal, Brooks and Systrends argue that because Group 8760 does not seek solely equitable relief, we must strictly construe the noncompetition provision so as to read into it the statutory language of § 8-1-1. They assert that our cases, which analyze noncompetition agreements in an equitable context and permit courts to restrict overly broad noncompetition agreements, do not apply to a case where money damages are sought in addition to injunctive relief. Because Brooks and Systrends raise this argument regarding strict construction and a circuit court's equitable power for the first time on appeal, we will not consider it. See, e.g., Bosarge Offshore, LLCv. Compass Bank, 943 So.2d 782 (Ala. 2006) ("`"`"This Court cannot consider arguments advanced for the purpose of reversing the judgment of a trial court when those arguments were never presented to the trial court for consideration or were raised for the first time on appeal."'"'") (quoting other cases);Brown ex rel. Brown v. St. Vincent's Hosp.,899 So.2d 227, 235 (Ala. 2004).
Under the evidence before the trial court at the time Brooks and Systrends moved for a judgment as a matter of law, Brooks's actions in violation of the non-competition provision implicated a geographically reasonable area. His work on the PEPCO and ERCOT matters, relating respectively to the District of Columbia and Texas, form the primary basis of Group 8760's breach-of-contract claim. The evidence showed that for most of the time Brooks worked on those matters he lived in Alabama. Accordingly, the trial court could have reasonably restricted the noncompetition provision to those areas and properly submitted Group 8760's claims to the jury. Because this Court "`may affirm a trial court's judgment on "any valid legal ground presented by the record, regardless of whether that ground was considered, or even if it was rejected, by the trial court,"'"Unum Life Ins. Co. of America v. Wright,897 So.2d 1059, 1082 (Ala. 2004) (quoting Liberty Nat'l Life Ins. Co.v. University of Alabama Health Servs. Found.,881 So.2d 1013, 1020 (Ala. 2003)), we affirm the trial court's denial of Brooks's and Systrends' motions for a judgment as a matter of law on this issue. See also Wilson v. Athens-LimestoneHosp., 894 So.2d 630, 634 (Ala. 2004).
Regarding Brooks and Systrends' additional argument that, as written, the noncompetition provision would impose an undue hardship on Brooks and was therefore void, we note that the provision merely prohibited Brooks from competing with Group 8760 for one year and did not otherwise prevent him from obtaining employment within the relevant industry. Furthermore, as restricted to the geographic areas at issue in the action, the provision imposed no undue hardship. We therefore affirm the trial court's denial of Brooks's and Systrends' motions for a judgment as a matter of law as to this argument as well. *Page 1082 
The trial court gave the jury the following charge regarding the validity of the noncompetition provision:
 "In Alabama a noncompetition agreement, restraining employment, . . . is disfavored because they [sic] tend to not only deprive the public of efficient services, but tend to impoverish the other individual.
 "However, under the law in Alabama, the courts will enforce a covenant not to compete or a noncompetition agreement in an employment contract if certain elements exist. Now, those elements are [these]: Number one, that the employer, that would be Group 8760, has a protectable interest. Number two, the restriction is reasonably related to that interest. Number three, the restriction is reasonable [in time and place]. Number four, the restriction imposes no undue hardship on the other party.
 "The burden is upon Group 8760 to show to you that this contract is not void and that it is enforceable under Alabama law. . . .
 ". . . .
 "In addition, the restriction must be reasonable [as to] time and place. As far as time and place is concerned, the territory of a covenant not to compete may properly include part of Alabama, all of Alabama, or more territory than the State of Alabama, depending upon the circumstances in each case. It's for you and you alone to decide that question in this matter, whether or not the area and time is reasonable or not for the protection of the interest of Group 8760 in this case.
 ". . . .
 ". . . [Y]ou must determine whether or not the contract between Group 8760 and Richard Brooks was valid and enforceable. . . ."
(R. 2333-35, 2336, 2347.)
No party objected to the trial court's submission to the jury for determination the questions of "whether or not the contract between Group 8760 and Richard Brooks was valid and enforceable" and "whether or not the area and time is reasonable or not for the protection of the interest of Group 8760 in this case." No party raises as an issue on appeal the submission of this charge to the jury or the propriety of this charge. The charge, therefore, which placed the determinations of whether the noncompetition provision was void and whether the provision was unreasonably restrictive as to location within the province of the jury, became the law of the case, and authorized the jury to act in conformity with that charge. See Alabama Dep't of Transp. v. Land Energy, supra.
After the jury's verdict for Group 8760, Brooks and Systrends renewed their motions for a judgment as a matter of law. Because the jury charges were then the law of the case, the renewed motions must be viewed in that legal context. From that viewpoint, the jury had the authority to, and did, decide that the noncompetition provision was valid and reasonably limited as to time. Under the evidence, and in light of the then existing law of the case, the trial court did not err in denying the renewed motions.
We do not today decide whether, or under what circumstances, Alabama courts might enforce a noncompetition agreement that specifies the "world" as a location. See Westwind Techs.,Inc. v. Jones, 925 So.2d 166, 172-74 (Ala. 2005) (See, J., concurring specially). Rather, given the specific procedural circumstances of this case, we decide that the trial court did not err in *Page 1083 
denying the motions for a judgment as a matter of law.
Finally, because we decide the jury's verdict was not based upon sufficient evidence from which it could allocate damages, as explained elsewhere, and Brooks and Systrends therefore are entitled to a new trial, we need not address their motions for a new trial based on the question of the validity of the noncompetition provision.
 The Tortious-Interference-with-Contract Claim Against Systrends
Systrends argues that it was entitled to a judgment as a matter of law on Group 8760's claim that it tortiously interfered with Brooks's employment agreement, because, it argues, that agreement was not enforceable. In that regard, Systrends adopts by reference the argument Brooks makes in his brief that the contract was void under Ala. Code 1975, § 8-1-1, because the geographic limitation of the non-competition provision was not reasonable. We do not find that argument well taken, for the reasons already discussed.
Systrends separately argues that because the restrictive covenant in Brooks's employment agreement appeared to Systrends to be void, it could not have intended to violate a valid contract. (Systrends' principal brief, pp. 52-53.) Systrends cites no authority in support of this argument and "[w]hen an appellant fails to cite any authority for an argument on a particular issue, this Court may affirm the judgment as to that issue, for it is neither this Court's duty nor its function to perform an appellant's legal research."City of Birmingham v. Business Realty Inv. Co.,722 So.2d 747, 752 (Ala. 1998).
Systrends' further argument that Group 8760 failed to prove that Systrends intended to interfere with the contract because the evidence actually showed that Systrends "went to significant links to insure" that it did not interfere with the restrictive covenant (Systrends' principal brief, p. 54), is not sustained, given the reasonable inferences the jury was entitled to draw from the totality of the evidence, as already analyzed.
That analysis also adequately established that Systrends' employment of Brooks in activities competitive to those of Group 8760 was detrimental to Group 8760. Accordingly, Systrends was not entitled to a judgment as a matter of law as to the tortious-interference-with-contract claim.
We do agree with Systrends, however, that there was no evidence from which the jury reasonably could have based a determination of the share of the total damages that should be assigned to this particular claim. No witness, and no exhibit, shed any light on what portion, percentage, or quantity of the $9 million lump-sum damages figure could be attributed to Systrends' interference with Brooks's employment agreement. Therefore, Systrends was entitled to a new trial on that basis, and the trial court erred in denying its motion in that regard. As explained earlier, elimination of the compensatory-damages award necessitates elimination of the punitive-damages award also.
Because of this disposition, we pretermit discussion of Systrends' several other arguments as to why it was entitled to a new trial.
 Conclusion
We reverse the judgments against Brooks and Systrends on the claims respectively made against them for violation of the ATSA and remand the case for entry of a judgment in their favor on those claims. We reverse the judgments entered against Brooks on the breach-of-fiduciary-duty and breach-of-contract claims, and the judgment entered against Systrends on the tortious-interference-with-contract claim, and we remand the *Page 1084 
case for entry of orders granting their motions for a new trial as to those claims. We affirm the judgment denying Group 8760's request for a permanent injunction and attorney fees under the ATSA.
1041548 and 1041795 — REVERSED AND REMANDED WITH INSTRUCTIONS.
1041569 and 1041930 — REVERSED AND REMANDED WITH INSTRUCTIONS.
1050058 — AFFIRMED.
NABERS, C.J., and SEE, LYONS, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
WOODALL, J., recuses himself.
[1] That board subsequently became known as the North American Energy Standards Board ("the NAESB"). For purposes of this appeal, however, the parties generally refer simply to "GISB," and this Court will follow suit.
[2] Rule 50, Ala. R. Civ. P., was amended in 1995 to rename the "motion for a judgment notwithstanding the verdict" as a "renewed motion for a judgment as a matter of law." We will use that terminology in this opinion.
[3] Systrends filed the written motion, and Brooks joined in it.